SMITH CORONA CORPORATION,
Plaintiff/Cross–Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

Brother Industries, Ltd., Brother International Corp.; Nakajima All Co., Ltd.; Canon Inc. and Canon U.S.A., Inc.; Silver Seiko, Ltd., Silver Reed America, Inc.; Matsushita Electric Industrial Co., Ltd., Kyushu Matsushita Electric Industrial Co., Ltd., and Panasonic Company and Panasonic Industrial Company, divisions of Matsushita Electric Corporation of America, Defendants–Appellants.

Nos. 89–1387 to 89–1389 and 89–1398 to 89–1400.

United States Court of Appeals, Federal Circuit.

Sept. 26, 1990.

Suggestion for Rehearing In Banc Denied Dec. 6, 1990.

684

Terence P. Stewart, Stewart & Stewart, Washington, D.C., argued for plaintiff/cross-appellant. With him on the brief were Eugene L. Stewart, James R. Cannon, Jr., John M. Breen and Lane S. Hurewitz.

Velta Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Wendell L. Willkie, II, Gen. Counsel, Stephen J. Powell, Chief Counsel for Import Admin. and Pamela Green, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel.

R. Sarah Compton, P.C., McDermott, Will & Emery, Washington, D.C., argued for defendants-appellants, Nakajima All Co., Ltd. With her on the brief was David J. Levine. Patrick F. O'Leary, Tanaka Ritger & Middleton, Washington, D.C., argued for defendants-appellants, Brother Industries, Ltd. and Brother International Corp. With him on the brief were H. William Tanaka and Alice Mattice. Also on the brief were Harvey M. Applebaum, David R. Grace, Covington & Burling, Washington, D.C., counsel for Canon Inc. and Canon U.S.A., Inc., Stuart M. Rosen, Karin M. Burke and A. Paul Victor, Weil, Gotshal & Manges, New York City, counsel for Matsushita Electric Indus. Co., Ltd., Panasonic Co. and Panasonic Indus. Co., divisions of Matsushita Elec. Corp. of America, Christopher A. Dunn, Zygmunt Jablonski and Sarah C. Middleton, Willkie, Farr & Gallagher, Washington, D.C., counsel for Silver Seiko, Ltd. and Silver Reed (U.S.A.), Inc.

Before NEWMAN, Circuit Judge, COWEN and BALDWIN, Senior Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

On this appeal taken by producers and importers of portable electric typewriters (PETs) with text memory, we affirm the decision of the Court of International

Trade[1] that these PETs are within the scope of the May 9, 1980 antidumping duty order issued by the United States Department of Commerce. On the cross-appeal of Smith Corona Corporation, we reverse the decision of the Court of International Trade refusing to suspend liquidation of the typewriters held to be subject to this order.

## BACKGROUND

On April 9, 1979 Smith Corona filed an antidumping petition with respect to PETs from Japan, in accordance with the Antidumping Act of 1921. The 1921 Act was superseded on January 1, 1980 by the Trade Agreements Act of 1979, Pub.L. No. 96–39 § 101, 93 Stat. 151, which transferred to the Department of Commerce responsibility for administering the antidumping provisions. The Treasury Department's tentative determination that the Japanese PETs were being sold at less than fair value was confirmed by the International Trade Administration of the Department of Commerce (ITA). *Portable Electric Typewriters from Japan*, 45 Fed. Reg. 18,416 (Dep't Comm.1980). The International Trade Commission found that the domestic industry was materially injured, and by final order of May 9, 1980 antidumping duties were imposed on imported PETs. *Portable Electric Typewriters from Japan*, 45 Fed.Reg. 30,618 (Dep't Comm.1980) (final order). The final order was directed to "portable electric typewriters from Japan" which "are those provided for in item 676.0510" of the Tariff Schedules of the United States (TSUS). 45 Fed. Reg. at 30,619.

The ITA determined in 1983 that electronic portable typewriters are covered by the order. *Portable Electric Typewriters from Japan*, 48 Fed.Reg. 7,768 (Dep't Comm.1983).

On administrative review initiated on November 27, 1985 the ITA determined that PETs with text memory were excluded from the antidumping duty order.[2] *Porta-*

*ble Electric Typewriters from Japan*, 52 Fed.Reg. 1504 (Dep't Comm.1987). Smith Corona appealed that determination to the Court of International Trade. 28 U.S.C. § 1581(c); 19 U.S.C. § 1516a(a)(2)(B)(vi) (providing that a "determination by the administering authority as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order" may be contested under section 1516a(a)(2)(A)).

The Court of International Trade reversed, on the basis that substantial evidence did not support the ITA's ruling. *Smith Corona Corp. v. United States*, 678 F.Supp. 285 (Ct.Int'l Trade 1987). The ITA held, after a second remand from the court, that PETs with text memory were included in the antidumping order. *Portable Electric Typewriters from Japan*, No. 88–127 (Dep't Comm. Nov. 23, 1988). On appeal from this holding the Court of International Trade affirmed the ITA's ruling, but refused to require the suspension of liquidation pending appeal to this court. *Smith Corona*, 706 F.Supp. 908. This appeal and cross-appeal followed.

## I

The appellant producers and importers assert that PETs with text memory are outside the scope of the final antidumping duty order of 1980.

## A

■■ The class or kind of merchandise encompassed by a final antidumping order is determined by the order, which is interpreted with the aid of the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order. *Alsthom Atlantique v. United States*, 4 Fed.Cir. (T) 71, 787 F.2d 565 (Fed.Cir.1986); *see generally Royal Business Machs. Inc. v. United States*, 507 F.Supp. 1007 (Ct.Int'l Trade 1980), *aff'd*, 669 F.2d 692 (CCPA

---

**1.** *Smith Corona Corp. v. United States*, 706 F.Supp. 908 (Ct.Int'l Trade 1989).

**2.** The review included the question of whether PETs with calculating mechanisms are within the scope of the final order. That issue is not before this court.

1982). Although the scope of a final order may be clarified, it can not be changed in a way contrary to its terms. *See Alsthom Atlantique*, 787 F.2d at 571, 4 Fed.Cir. (T) at 78.

The antidumping petition filed by Smith Corona in 1979, in accordance with 19 C.F.R. § 153.27(a)(2) (1979), defined the goods as "all portable electric typewriters, whether utilizing typebars or single elements, and whether fully electric with powered carriage return, and whether with conventional ribbons or with cartridge or cassette ribbon." The tariff classification was identified as TSUS item 676.0510. Schedule 6, Part 4, Subpart G, of the TSUS contains the following classification:

| ITEM | STAT. SUFFIX | ARTICLES |
|------|------|------|
| | | Typewriters not incorporating a calculating mechanism: |
| 676.05 | | Non-automatic with hand-operated keyboard ................ |
| | | Portable: |
| | 10 | Electric ................. |
| | 30 | Non-electric ............. |
| | | Other: |
| | 40 | Electric ................. |
| | 60 | Non-electric ............. |

At the time of the investigation all imported portable electric typewriters were encompassed by TSUS 676.0510.[3] Although typewriters with text memory were found to have existed at the time of the antidumping investigation, they were of large size and not portable, and therefore not included in the investigation. *Portable Electric Typewriters from Japan*, No. 87–145, slip op. at 3 (Dep't Comm. March 18, 1988). With advances in technology, text memory capability became incorporated in portable electronic typewriters imported after the date of the order. It is the status of these typewriters that is at issue.

■ In determining the status of products that have been modified since the issuance of an order, the initial inquiry is whether the products were specifically included within the order. *See Alsthom Atlantique*, 4 Fed.Cir. (T) at 78, 787 F.2d at 571; *Royal Business Machs.*, *supra*. If

the final order did not clearly include or exclude the modified products, then guidance as to the intended scope of the order may be sought by application of the criteria set forth in *Diversified Products v. United States*, 572 F.Supp. 883 (Ct.Int'l Trade 1983). The Court of International Trade, reviewing the order in light of the entirety of the administrative investigations and determinations, held that the text memory PET's were included within the scope of the final order.

■ The Court of International Trade considered the argument of the importers/producers that because text memory PETs were classified, upon their importation after the final order was issued, under a tariff classification other than 676.0510, these typewriters are expressly excluded from the final order. A similar question had arisen, in connection with the same final order, applied to a Japanese electronic typewriter model known as the Royal "Administrator". In that case, after issuance of the final order the Customs Service reclassified the "Administrator" from TSUS 676.0510 (Portable: Electric) to TSUS 676.-0540 (Other: Electric), and the manufacturer petitioned to exclude the "Administrator" from the final order based on the reference in the order to TSUS 676.0510. The Court of International Trade rejected this argument, stating that classification under the antidumping law need not match the Customs classification, and that factors in addition to the TSUS classification are to be considered. *Royal Business Machs.*, 507 F.Supp. at 1014. The separate classification of large size, non-portable typewriters with text memory, at the time of the investigation, and their removal from the scope of the order because they were not portable, does not *ipso facto* remove portable text memory typewriters from the scope of the order. The Court of International Trade noted in *Royal Business Machs.*:

The determinations under the antidumping law may properly result in the cre-

---

**3.** Pursuant to the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1147, 1153, effective January 1, 1989, the Harmonized Tariff Schedule (HTS) replaced the TSUS. HTS Item 8469.10 reads: "Automatic typewriters and word processing machines". Item 8469.21 reads: "Other typewriters, electric: Weighing not more than 12 kg, excluding case."

ation of classes which do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by the Customs Service. Within the context of an antidumping proceeding the administering agency, at the proper time, can define the class in its terms.

*Id.* at 1014 n. 18.

As discussed in *Royal Business Machs.*, the investigation leading to the 1980 order was directed to portable electric typewriters broadly. The antidumping petition defined the goods as "all portable electric typewriters", and at the time of the investigation and final order all imported commercial portable electric typewriters were classified under TSUS 676.0510. The Court of International Trade correctly held that the reference to TSUS 676.0510 in the final order is not dispositive, and that a change in tariff classification after the investigation and order does not of itself change the intended scope of the order, although it is a factor to be considered, along with all factors pertinent to the issue of the intended scope of the order.

### B

■ The Court of International Trade stated that "in every scope determination involving a new product, the ITA should examine the product in light of the *Diversified Products* criteria to determine whether the product is of the class or kind of merchandise contemplated by the pertinent antidumping finding." *Kyowa Gas Chemical Indus. v. United States*, 7 CIT 138, 582 F.Supp. 887 (1984); *see Ipsco Inc. v. United States*, 715 F.Supp. 1104, 1107 n. 3 (Ct. Int'l Trade 1989); *Kyowa Gas Chemical Indus. v. United States*, 7 CIT 311 (1984 WL 3729) (1984). These criteria are "the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels of trade in which the merchandise moves, the ultimate use of the merchandise, and cost." *Diversified Products*, 572 F.Supp. at 888 (citations omitted). We agree that these criteria are a sound approach to determining the status

of products that have been modified since the time of the investigation and final order.

These criteria were considered by the Court of International Trade, in turn reviewing the findings of the ITA. Starting with the general physical characteristics of the goods, the PETs with text memory are described as having a space for display of varying number of lines of text, depending on the model, and having a few additional keys, again depending on the model and the features provided. It was undisputed that the imported typewriters generally look like typewriters, and are small enough in size and weight as to be portable. *Smith Corona*, 698 F.Supp. at 249; *Portable Electric Typewriters from Japan*, slip. op. 87–145 at 4.

The additional features of text memory PETs enable the operator to store, edit, and retype text from electronic memory. These capabilities, the Court of International Trade found, do not change the primary function as portable typewriters: "Each machine is still dedicated to producing on paper printed letters and other characters as a substitute for handwritten ones through manual use of an electrically-actuated keyboard contained in a unit of such size and weight as to be susceptible to single-hand portage." *Smith Corona*, 698 F.Supp. at 249. We discern no error in the Court of International Trade's conclusion that "[w]hile such components constitute physical differences, they do not add up to a different class or kind of merchandise." *Id.*

Nor has reversible error been shown in the Court of International Trade's findings to the effect that the expectations are similar, of consumers of PETs with and without text memory. Like the PETs of 1979, PETs with text memory are primarily used at home and by students, and are not for commercial use. The record showed that to consumers seeking a portable electric typewriter the addition of text memory was viewed as an attractive feature, not a distinguishing characteristic, and that text memory PETs were viewed as typewriters, not as computers.

There is no dispute that the channels of trade for PET's with and without text memory are identical. They are sold in the same retail stores, and are advertised as portable electric typewriters. The cost of PETs containing text memory is not significantly greater than the cost for PETs without text memory. The court found that relative cost does not distinguish the machines before us.

Reversible error has not been shown in these findings and conclusions of the Court of International Trade. 19 U.S.C. § 1516a(b)(1)(B); *see Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n. 10, 2 Fed.Cir. (T) 130, 133 n. 10 (Fed.Cir.1984) (review of Court of International Trade review of the findings and conclusions of the ITA); *Smith–Corona Group v. United States*, 713 F.2d 1568, 1583 (Fed.Cir.1983).

The holding that PETs with text memory are within the scope of the May 9, 1980 antidumping duty order is affirmed.

## II

■ The Court of International Trade withheld publication of notice of its decision, and denied Smith Corona's motion to suspend liquidation pending appeal to the Federal Circuit. The court determined that 19 U.S.C. § 1673, which provides for the imposition of antidumping duties, is silent on the subject of liquidation; and that sections 1673b(d) and 1673d(c)(1)(B) of that title mandate suspension only after final determination of sales at less than fair value, which determination, according to the court, had not occurred. The court erred in its statutory reading and application.

Liquidation of goods is provided for in 19 U.S.C. § 1516a(c)(1), which requires prompt publication of notice of the court's decision. The statute states:

**(1) Liquidation in accordance with determination**

Unless such liquidation is enjoined by the court under paragraph (2) of this subsection, entries of merchandise of the character covered by a determination of the Secretary, the administering authority, or the Commission contested under sub-section (a) of this section [relating to an existing order] shall be liquidated in accordance with the determination of the Secretary, the administering authority, or the Commission if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the Federal Register by the Secretary or the administering authority of a notice of a decision of the United States Court of International Trade, or of the United States Court of Appeals for the Federal Circuit, not in harmony with that determination. *Such notice of a decision shall be published within ten days* from the date of the issuance of the court decision. [Emphasis added.]

This provision makes clear that the decision of the Court of International Trade, or of the Federal Circuit, is of controlling effect when rendered, and that each such decision must be published within ten days after its issuance. In *Timken v. United States*, 893 F.2d 337 (Fed.Cir.1990) we held that § 1516a(c)(1) requires publication of notice of a contrary decision of the Court of International Trade, and requires suspension of liquidation upon publication of the notice. *Id.* at 340.

Such suspension is not automatically lifted when the decision of the Court of International Trade is appealed to the Federal Circuit. Suspension of liquidation continues until a "conclusive" court decision is reached, *i.e.*, a decision that is not subject to further appeal or collateral attack. 19 U.S.C. § 1516a(e); *Timken*, 893 F.2d at 339.

The February 3, 1989 decision of the Court of International Trade was a decision within the scope and meaning of § 1516a(c)(1). Notice of the Court of International Trade decision should have been published within ten days thereafter, and liquidation should have been suspended. The court's refusal to order such action is reversed.

## COSTS

Costs on appeal and cross-appeal to Smith–Corona.

AFFIRMED IN PART, REVERSED IN PART.