MURATA MANUFACTURING COMPA-
NY, LTD. and Murata Electronics
North America, Inc., Plaintiffs,

v.

UNITED STATES, Defendant.

Slip Op. 95–192.
Court No. 92–04–00272.

United States Court of
International Trade.

Nov. 22, 1995.

Arnold & Porter (Richard A. Johnson, Michael T. Shor, Susan T. Morita), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michael S. Kane), Washington, DC, for defendant.

Timothy A. Harr, Washington, DC, for amicus curiae Motorola, Incorporated.

**OPINION**

CARMAN, Judge:

Plaintiffs, Murata Manufacturing Company, Ltd. and Murata Electronics North America, Incorporated [1] (collectively "Murata"), filed a motion for judgment upon the agency record pursuant to U.S. CIT R. 56.2 to appeal the final scope ruling by the International Trade Administration (ITA), United States Department of Commerce (Commerce or Department) in *Final Scope Ruling on the Request By Murata for Clarification of the Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies From Japan* (date stamped Mar. 31, 1992) (*Scope Ruling II* ), *reprinted in* App. to Pls.' Br. in Supp. of Mot. for J. Upon the Agency R. (Pls.' App.) Tab 1. Murata commenced this action under 19 U.S.C. § 1516a(a)(2)(B)(vi) (1988). The United States Court of International Trade (CIT) has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (1988).

## I. BACKGROUND

In 1984, Motorola, Incorporated, (Motorola) an American manufacturer of cellular mobile telephones (CMTs), petitioned Commerce to initiate an antidumping investigation of all CMTs manufactured in Japan, plus all mobile transceivers or kits of components and subassemblies manufactured in Japan for use in final assembly of CMTs. Subsequent investigations by Commerce established that CMTs and CMT subassemblies from Japan were being sold in the United States at less than fair value (LTFV), and that the sales of those products were materially injuring a United States industry. *See Cellular Mobile Telephones and Subassemblies From Japan,* 50 Fed. Reg. 45,447 (Dep't Comm.1985) (final determ. of sales at LTFV) (*Final Determination* ); *Cellular Mobile Telephones and Subassemblies Thereof From Japan,* USITC Pub. 1786, Inv. No. 731–TA–207 (Dec. 1985) (final) (*ITC Final Report* ). Accordingly, Commerce issued an antidumping order encompassing CMTs, CMT transceivers, CMT control units, and certain subassemblies thereof. *See Antidumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan,* 50 Fed.Reg. 51,724 (Dep't Comm.1985) (CMT Order or Order).

### A. Scope of the Investigation

The scope of the investigation underlying the CMT Order is described in the *Final Determination* as "cellular mobile telephones (CMTs), CMT transceivers, CMT control units, and certain subassemblies thereof." *Final Determination,* 50 Fed.Reg. at 45,447. Commerce explains the coverage of "subassemblies" in the CMT Order as follows:

> Subassemblies are any completed or partially completed circuit modules, the value of which is equal to or greater than five dollars, and which are dedicated exclusively for use in CMT transceivers or control units. The term "dedicated exclusively for use" only encompasses those subassemblies that are specifically designed for

---

**1.** At the time it filed its motion, Murata Electronics North America, Incorporated was named Murata Erie North America, Incorporated.

use in CMTs, and could not [be] used, absent alteration, in a non-CMT device. *Id.* at 45,448. Thus, the CMT Order defines a subassembly falling within the scope of the Order as one satisfying a three-part definition: (1) it must be a completed or partially completed circuit module; (2) the value of which is equal to or greater than five dollars; and (3) dedicated exclusively for use in CMT transceivers or control units, only encompassing those subassemblies that are specifically designed for use in CMTs, and could not be used, absent alteration, in a non-CMT device. The scope of the CMT Order has been challenged in other proceedings before this Court and the Court of Appeals for the Federal Circuit (CAFC).[2]

### B. *Scope Ruling I*

To frame the discussion of *Scope Ruling II* in this case, it is necessary to examine a prior scope ruling, which Commerce issued in response to an earlier scope ruling request by Murata. In January 1986, Murata filed a request for a scope ruling seeking a determination that eleven specific components it imported were outside the scope of the CMT Order. In January 1991, Commerce requested comments from interested parties regarding Murata's scope ruling request. Murata advanced three arguments to support its position: (1) Murata was not a CMT manufacturer, nor related to one; (2) the components were not CMT subassemblies as that term is defined in the CMT Order; and (3) the components were not "dedicated exclusively for use" in CMTs, and therefore were not within the scope of the CMT Order. On August 30, 1991, Commerce rejected Murata's claims and determined Murata's eleven components were within the scope of the CMT Order.

*See* International Trade Administration, United States Department of Commerce: *Final Determination—Request By Murata Erie North America Inc., and Murata Manufacturing Co., Ltd., to Exclude Duplexers, Voltage Control Oscillators, and Active Filters from the Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies from Japan* (date stamped Aug. 30, 1991) 18–19 (*Scope Ruling I* ), *reprinted in* Pls.' App. Tab 2.

Murata challenged *Scope Ruling I* in a consolidated action wherein plaintiffs, including Murata, argued Commerce changed the scope of the CMT Order in a manner inconsistent with its original terms and improperly extended the scope of the Order to include independently-traded components produced by non-CMT manufacturers without analyzing whether such components were the same "class or kind" of merchandise as CMTs. The CIT agreed with plaintiffs and held *Scope Ruling I* unlawfully expanded the scope of the CMT Order by altering the definition of subassemblies. *Ericsson GE Mobile Communications Inc. v. United States,* 17 CIT 571, 578–79, 825 F.Supp. 1085, 1091 (1993) (*Ericsson I* ), *aff'd in part, vacated in part, and remanded,* 13 Fed.Cir. (T) ——, 60 F.3d 778 (1995) (*Ericsson III* ). Specifically, the CIT held in *Ericsson I* that Commerce impermissibly expanded the CMT Order by changing the third part of its definition of subassemblies, the "dedicated exclusively for use" part, to require importers to show: (1) their products are "actually used" in a non-CMT product; (2) the actual alternative use occurs in the United States subsequent to importation; and (3) the actual use in the United States is commercially available. *Ericsson I,* 17 CIT at 578–81, 825

---

**2.** *See, e.g., Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 700 F.Supp. 538 (1988) (*Mitsubishi I* ), *aff'd,* 8 Fed.Cir. (T) 45, 898 F.2d 1577 (1990) (*Mitsubishi II* ); *Mitsubishi Elec. Corp. v. United States,* 16 CIT 730, 802 F.Supp. 455 (1992) (*Mitsubishi III* ), *aff'd,* 12 Fed.Cir. (T) ——, 11 F.3d 1070 (1993) (table). In *Mitsubishi I,* plaintiffs challenged, *inter alia,* Commerce's decision in the *Final Determination* to include CMT subassemblies within the scope of the CMT Order. The CIT upheld the Commerce's determination that discrete CMT subassemblies are within scope of the Order. The CAFC affirmed.

In *Mitsubishi III,* the CIT held Commerce's 1991 scope ruling unlawfully expanded the scope of the CMT Order by requiring importers to prove their CMT subassemblies were actually employed in the production of non-CMT devices in the United States to avoid having their products deemed "dedicated exclusively for use" in CMT transceivers or control units. *Mitsubishi III,* 16 CIT at 737–38, 802 F.Supp. at 461. The Court found no language in the CMT Order requiring such a showing and therefore held this new standard was not sustainable as a mere clarification of the Order. *Id.* The CAFC affirmed.

F.Supp. at 1091–93. The CIT held "these requirements are not implicit in the Order, but instead amount to an expansion of the scope of the CMT Order." Accordingly, the CIT set aside and vacated *Scope Ruling I. Id.* at 583, 825 F.Supp. at 1094.[3]

Because the CIT in *Ericsson I* found Commerce unlawfully expanded the third part of the subassemblies definition, the Court did not reach plaintiffs' argument that Commerce had abandoned the first part of the definition—the "completed or partially completed circuit modules"—and substituted a new test requiring inquiry as to whether the component was necessary to perform a function of the CMT or contribute to a function necessary for a CMT. *Id.* at 578, 825 F.Supp. at 1091. This issue is now before this Court in the instant action.

The CIT in *Ericsson I* did consider plaintiffs' argument that Commerce unlawfully expanded the scope of the CMT Order to cover independently-traded subassemblies without first determining whether independently-traded components were within the "class or kind" of merchandise covered by the Order. *See id.* at 582–83, 825 F.Supp. at 1094. Plaintiffs argued Commerce limited its original analysis in the *Final Determination* to related subassemblies and thus did not decide the independently-traded components issue. *See id.* at 582, 825 F.Supp. at 1094. The Court found the language in the *Final Determination* supported plaintiffs' arguments:

> [B]efore Commerce concludes in further scope rulings based on the Order at issue that independently traded subassemblies are the "same class or kind" of merchandise covered by the Order, it must first apply the same factors it applied to in-house subassemblies in the *Final Determination.*

*Id.* at 583, 825 F.Supp. at 1094. The question whether independently-traded compo-

nents are properly included within the scope of the Order is also at issue in the instant action.

## C. Scope Ruling II

In January 1992, prior to the CIT's decision in *Ericsson I*, Murata initiated a second scope request asking Commerce to find that all of Murata's electronic components were outside the scope of the CMT Order on the grounds that

> (i) Murata's independently-traded components are not the same "class or kind" of merchandise as complete CMTs, (ii) Murata's components are not "circuit modules," and therefore not "subassemblies" within the meaning of the *CMT Order,* and (iii) Murata's components as a whole are not "dedicated exclusively for use" in CMT transceivers or control units.

(Pls.' Br. in Supp. of Mot. for J. Upon the Agency R. (Pls.' Br.) at 13 (footnote omitted).) On March 31, 1992, Commerce ruled on Murata's second scope request by expressly relying on its findings in *Scope Ruling I* and responding that Murata "has provided no new information to support its argument that its components should be excluded from the order. Based on this, we determine that reconsideration of the decision is unwarranted and a scope inquiry is unnecessary." *Scope Ruling II* at 5.

The bulk of *Scope Ruling II* describes the procedural history of Murata's challenges to the CMT Order and summarizes Murata's previous scope ruling request. The Analysis section of the ruling refers to the August 30, 1991, determination, which is *Scope Ruling I,* and states in full:

> The regulations provide that in response to an application for a scope determination, the Department may conclude that no inquiry is warranted to determine whether a product is included within the scope of an order. Because the issue presented is di-

---

**3.** In *Ericsson III*, the CAFC affirmed the CIT's decision in *Ericsson I* to vacate the scope ruling and agreed that Commerce impermissibly expanded the scope of the CMT Order. *Ericsson III*, 13 Fed.Cir. (T) at ——, 60 F.3d at 779. The CAFC also held, however, the CIT should not have entered final judgment for plaintiffs on the record before the CIT. *Id.* at ——, 60 F.3d at

783. "[T]he Commerce Department should be given another opportunity to interpret the order at issue in this case," the CAFC explained. *Id.* Thus, the CAFC reversed the CIT's decision in part and remanded the case to permit Commerce "to interpret the order according to any of its legally acceptable options." *Id.*

rectly related to the Department's August 30, 1991, determination regarding Murata's subassemblies, the Department determines that no inquiry is warranted. *See* 19 CFR 353.29(b).

As articulated in the May 31, 1991, preliminary determination and the August 30, 1991, final determination regarding certain CMT subassemblies produced by Murata. The order was established on CMTs and CMT subassemblies from Japan. The order covers CMT subassemblies that are dedicated exclusively for use within CMTs and have a value of five dollars or more. There is no distinction made in the order as to whether the CMT subassemblies are made by CMT manufacturers or by non-CMT manufacturers.

As the Department stated in its preliminary scope determination of May 31, 1991, and upheld in its August 30, 1991 final scope determination, the order does not make any distinction between CMT manufacturers and non-CMT manufacturers. During the inquiry on Murata's first scope clarification request, the Department addressed arguments from the respondents (including Murata) that subassemblies from non-CMT manufacturers were not within the scope of the order by referring to its "class or kind" analysis from the original less than fair value (LTFV) investigation. The Department stated in its original LTFV investigation that while it had reason to believe that some CMT components purchased by CMT manufacturers from non-CMT manufacturers may not be dedicated exclusively for use in CMTs, the Department determined that if a subas-

sembly did not meet the "dedicated exclusively for use" criteria, it would not be covered by the order.

The order covers CMT subassemblies exported to the United States from Japan, dedicated exclusively for use in CMTs, and have a value of five dollars or more are nonetheless covered by the order.

*Id.* at 4–5.

## II. CONTENTIONS OF THE PARTIES

### A. *Plaintiffs*

Murata first principal argument is that *Scope Ruling II* unlawfully expanded the "class or kind" of merchandise covered by the CMT Order to include independently-traded components. To support this contention, Murata argues first the Court in *Ericsson I* held that before Commerce concluded in further scope rulings based on the CMT Order that independently-traded subassemblies were within the "class or kind" of merchandise covered by the CMT Order, Commerce " 'must first apply the same factors it applied to in-house subassemblies in the *Final Determination*.' " (Pls.' Br. at 3 (quoting *Ericsson I*, 17 CIT at 583, 825 F.Supp. at 1094).) Because Commerce failed in *Scope Ruling II* to apply such factors, known as the *"Diversified Products"* factors,[4] Murata complains the agency erred.[5] Second, Murata argues the record in this case demonstrates that neither Commerce nor Motorola intended to include independently-traded components in the LTFV investigation. Therefore, Murata reasons, "independently-traded components produced by non-CMT manufactures should be excluded" from the

---

**4.** In *Diversified Prods. Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983), the Court reviewed the ITA's application of certain criteria to determine if the merchandise under review belonged to the "class or kind" of merchandise encompassed by the dumping finding. *Diversified Prods. Corp.,* 6 CIT at 162–63, 572 F.Supp. at 889–90. The ITA had considered: "the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels of trade in which the merchandise moves, the ultimate use of the merchandise, and cost." *Id.* at 162, 572 F.Supp. at 889 (citations omitted). Upon review of the ITA's application of these factors, the Court upheld the ITA's "same class or kind" determination. All of these factors,

except cost, have been codified at 19 C.F.R. § 353.29(i)(2)(i)–(iv) since 1990.

**5.** Murata claims that when the *Diversified Prods.* factors are applied to Murata's independently-traded components "the only possible conclusion is that such components are a different 'class or kind' of merchandise than complete CMTs." (Pls.' Br. at 17; *see also id.* at 29–38.) On this point, Murata suggests, a remand is unnecessary because when the "application of correct legal principles could lead to only one conclusion— that independent components are a different 'class or kind' of merchandise—there is no need to remand to the administrative agency for reconsideration." (*Id.* at 31 (citations omitted).)

CMT Order because non-CMT manufacturers cannot circumvent an order targeted at CMTs. (*Id.* at 28–29.) Third, Murata claims Commerce is precluded from arguing that independently-traded components are covered by the CMT Order because Commerce previously informed the Court during oral argument in *Mitsubishi I* that independently-traded components were not covered. (*Murata* Tr. at 30–31.) Thus, Murata asks this Court to apply the doctrine of judicial estoppel to foreclose Commerce from changing its position in this proceeding. (Pls.' Reply Br. in Support of Mot. for J. Upon the Agency R. (Pls.' Reply Br.) at 12–15.)

Murata's second principal contention is that by ruling Murata's components are "circuit modules" within the meaning of the CMT Order, *Scope Ruling II* "violates the well-established principle that Commerce may not change the scope of an order in a manner inconsistent with its original terms." (Pls.' Br. at 17 (citations omitted).) Murata contends Commerce erected a wholly new test to define a partially completed circuit module when the agency stated "components that contribute to any CMT function are partially completed circuit modules and therefore are subassemblies covered by the order." *Scope Ruling II* at 2, *quoted in* Pls.' Br. at 40 (emphasis omitted). Murata complains this "new 'contributes to a CMT function' test is so broad that it essentially eviscerates the term 'circuit module' of any substantive meaning. Any component, no matter how small or minor, could be said to 'contribute' to a CMT function, and thus ... be a 'partially completed circuit module.'" (Pls.' Br. at 41 (footnote omitted).) Murata traces the use of the term "circuit module" from Motorola's petition through the preliminary and final LTFV determinations and concludes Commerce developed a narrow, precise definition that does not include discrete electronic components. (*Id.* at 41–48.)

**B. Defendant**

Commerce responds that it correctly applied the three-part definition of CMT subassemblies and determined that independently-traded subassemblies are within the "class or kind" of merchandise covered by the CMT Order. (Def.'s Mem. in Opp'n to Pls.' Mot. for J. Upon the Admin.R. (Def.'s Br.) at 27.) There is no distinction in the CMT Order, Commerce argues, between the manufacturers of subassemblies and those who assemble subassemblies into CMTs. The three criteria in the Order "apply with equal force, regardless of the relationship between the parties." (*Id.* at 25.) To support its argument, Commerce points to the *Final Determination* where the agency observed, "[w]hile some CMT subassemblies ... may be purchased by CMT manufacturers from unrelated parties ... such separately traded items may not meet the 'dedicated exclusively for use' criterion, and therefore might not be covered by the scope of any order." *Final Determination*, 50 Fed.Reg. at 45,451, *quoted in* Def.'s Br. at 25. Commerce argues this plainly demonstrates "the relevant inquiry is whether the imported subassemblies are 'dedicated exclusively for use in CMTs'—as opposed to the identity of the party who finally assembles the subassemblies into the completed CMTs." (Def.'s Br. at 26.)

Commerce rejects Murata's call for a *Diversified Products* analysis. To begin, Commerce argues such an analysis is usually employed to determine whether newly developed products are included in a pre-existing antidumping duty order. (*Id.* at 29 (citation omitted).) Commerce also suggests a resort to the *Diversified Products* analysis is appropriate to clarify an ambiguous order or to determine whether two physically different items are properly included within the same "class or kind" of merchandise. None of these circumstances are present here, Commerce argues, and thus resort to *Diversified Products* is unnecessary. Furthermore, Commerce contends this Court may not "require Commerce to perform an additional 'class or kind' analysis based upon an analysis of commercial factors, such as the *Diversified Products* factors, when the merchandise at issue is physically identical to the merchandise described in an antidumping duty order." (*Id.* at 21 (citing *Alsthom Atlantique v. United States*, 4 Fed.Cir. (T) 71, 78, 787 F.2d 565, 571 (1986)).)

In response to Murata's arguments concerning the definition of circuit modules, Commerce contends the *Final Determination* "deliberately rejected a descriptive, technical, or functional definition of those subassemblies covered by the CMT Order in favor of a clear-cut, objective standard based upon the dollar value of the merchandise." (*Id.* at 35 (citation omitted).) Commerce submits it sought to avoid "wading into the technical morass" of descriptive definitions, and instead adopted a bright-line, dollar value cut-off of five dollars to delineate those subassemblies covered under the Order. (*Id.* at 36.) This standard was specifically upheld by the CIT and the CAFC, Commerce continues, and Murata's arguments that the Court should adopt a descriptive standard are flatly inconsistent with these judicial determinations. Commerce considers Murata's present challenge "simply a transparent attempt to relitigate the outcome of the prior ... determinations which upheld the five-dollar standard." (*Id.* at 37-38.)

### III. STANDARD OF REVIEW

In an action challenging Commerce's determination that imported merchandise is covered by an existing antidumping duty order, this Court must review whether the challenged determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987).

### IV. DISCUSSION

■ "It is well established ... that the ITA has the authority to clarify the scope of its antidumping duty orders. Commerce, however, may not expand the scope of such orders beyond the merchandise encompassed by the final less than fair value determinations." *Mitsubishi III,* 16 CIT at 733-34, 802 F.Supp. at 458 (citations omitted). Although Commerce "enjoys substantial freedom to interpret and clarify its antidumping orders .... it may not change them." *Ericsson III,* 13 Fed.Cir. (T) at ——, 60 F.3d at 782 (citing *Smith Corona Corp. v. United States,* 8 Fed.Cir. (T) 180, 182, 915 F.2d 683, 686 (1990) ("Although the scope of a final order may be clarified, it can not be changed in a way contrary to its terms.") (citation omitted)).

At the outset, the Court notes that insofar as *Scope Ruling II* explicitly incorporates *Scope Ruling I,* which was vacated and set aside by this Court, there is a strong argument that *Scope Ruling II* must fall in turn.[6] For example, Commerce states in *Scope Ruling II* that the issue before Commerce is "directly related" to *Scope Ruling I* and that "[a]ll of the arguments presented in Murata's [second scope ruling] request were taken into consideration in [*Scope Ruling I*]." *Scope Ruling II* at 5. Commerce then concludes:

> Murata has provided no new information to support its argument that its components should be excluded from the order. Based on this, we determine that reconsideration of the decision is unwarranted and a scope inquiry is unnecessary. Therefore, the Department, taking precedence from [*Scope Ruling I*] ... determines that Murata's electronic components ... fall within the scope of the order....

*Id.* In light of the foregoing, the Court finds *Scope Ruling I* is inextricably linked to the analysis and conclusions reached in *Scope Ruling II.* (*See supra* part I.C.) Thus, because this Court vacated and set aside *Scope Ruling I* in *Ericsson I,* and that order has been upheld by the CAFC, the Court holds *Scope Ruling II* is vacated to the extent that it relies upon *Scope Ruling I* and unlawfully expands the CMT Order. *Scope*

---

**6.** This argument was not raised in the papers before the Court inasmuch as the CAFC's decision in *Ericsson III* had not issued when the parties prepared their papers. The argument was raised, however, in oral argument when plaintiffs' counsel stated, "[T]his Court and the CAFC have vacated scope ruling one. It's null and void. By definition, Commerce's scope ruling two can no longer be correct because it was based solely on a vacated decision." (*Murata* Tr. at 27-28.)

*Ruling II* is remanded in part and sustained in part for the following reasons.

## A. Independently–Traded Components

 The starting point for determining whether independently-traded components are within the "class or kind" of merchandise described in the CMT Order is to examine the descriptions of the merchandise in the petition, the initial investigation, the determinations of the ITA and the International Trade Commission (ITC), and the resulting antidumping duty order. *See* 19 C.F.R. § 353.29(i)(1) (1991); *see also Nitta Indus. Corp. v. United States,* 11 Fed.Cir. (T) ——, ——, 997 F.2d 1459, 1461 (1993) (citing *Smith Corona Corp.,* 8 Fed.Cir. (T) at 182, 915 F.2d at 685 ("The class or kind of merchandise encompassed by a final antidumping order is determined by the order, which is interpreted with the aid of the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order.") (citations omitted)). Turning first to the petition, Motorola was careful to include not only completed CMTs in its petition, but also "collections of cellular mobile telephone subassemblies ('kits')." (*Antidumping Petition on Behalf of Motorola, Inc.* 11 (Nov. 5, 1984) (petition), *reprinted in* Pls.' App. Tab 14.) Motorola stated the inclusion of kits was "essential to prevent the Japanese manufacturers from avoiding the impact of any final relief ... by simply importing mobile transceivers or kits containing most of the necessary subassemblies or components into the United States for final assembly and testing." (*Id.* (footnote omitted).) The petition then, can be read to include only those subassemblies from related manufacturers, that is, those subassemblies that could be reassembled into complete CMTs upon importation to related companies thereby evading the antidumping order. Similarly, the ITC in its investigation observed that "most subassemblies manufactured by these firms were used proprietarily in the manufacture of transceivers and control units. A neglible [sic] volume was sold

to foreign and/or other U.S. manufacturers." (*ITC Final Report,* at A–7; *see also id.* at A–11 ("Subassemblies are not discussed separately because producers do not regularly maintain separate data on these items: *virtually all of these items are used proprietarily* in the manufacture of transceivers and control units.") (emphasis added).) Finally, in the preliminary and final LTFV determinations, Commerce stated the purpose of including subassemblies was "to prevent circumvention of any antidumping order on CMTs through the importation of major CMT subassemblies," which could easily be reassembled into complete CMTs thereby evading the Order. *Cellular Mobile Telephones and Subassemblies From Japan,* 50 Fed.Reg. 24,554, 24,455 (Dep't Comm.1985) (prelim. determ. of sales at LTFV) (*Preliminary Determination*); *Final Determination,* 50 Fed.Reg. at 45,448.[7] Thus, Commerce's investigation initially appears to include only those subassemblies moving between related parties, presumably because circumvention of a CMT Order would seem especially likely in such cases. Nevertheless, there appears to be little on the record that would justify excluding subassemblies that meet the three-part definition from being within the scope of the Order merely because they were independently traded. For Commerce to exclude such subassemblies for this reason would seem to invite evasion of the legitimate purposes of the CMT Order. Indeed, in the *Final Determination* Commerce did not expressly exclude independently-traded subassemblies from the Order but instead chose to note "[w]hile some CMT subassemblies ... may be purchased by CMT manufacturers from unrelated parties ... such separately traded items may not meet the 'dedicated exclusively for use' criterion, and therefore might not be covered by the scope of any order." *Final Determination,* 50 Fed.Reg. at 45,451. This seems to demonstrate Commerce's intent to include independently-traded subassemblies within the scope of the Order provided such subassemblies satisfy

---

7. Commerce observed that "[t]wo of the companies investigated export CMT subassemblies to the United States *to related companies* which subsequently perform some form of further manufacture or assembly before selling the complet-

ed CMTs to unrelated parties." *Preliminary Determination,* 50 Fed.Reg. at 24,455 (emphasis added); *Final Determination,* 50 Fed.Reg. at 45,-448 (same).

the three-part definition of subassemblies as described in the Order.

■ After review of the descriptions of the merchandise under investigation as expressed in the petition, the initial investigation, the determinations of the ITA and ITC, and the CMT Order, the Court finds it is not clear if Commerce meant to include independently-traded components in its investigation and subsequent Order. This is not to say that independently-traded components are not covered by the CMT Order.[8] Because the above evidence is not dispositive, however, Commerce must follow its regulatory regime to determine whether independently-traded components are within the "class or kind" of merchandise described in the Order. *See* 19 C.F.R. § 353.29(i)(2).[9] Those rules provide that Commerce shall apply the *Diversified Products* criteria, promulgated at 19 C.F.R. § 353.29(i)(2)(i)–(iv), when an examination of the petition, the initial investigation, and the ITA and ITC determinations is not dispositive as to whether a particular product is within the "class or kind" of merchandise described in an existing order. *See also Nitta Indus. Corp.*, 11 Fed.Cir. (T) at ——, 997 F.2d at 1461 ("[I]n the event that [ITA] cannot make a scope determination based on this information, it then looks to the *Diversified Products* criteria. Such an analysis finds support in the law. . . .") (citations omitted).

The Court's analysis here is consistent with the CIT's consideration in *Ericsson I* of whether independently-traded subassemblies were within the "class or kind" of merchandise described in the Order.[10] Given that the

---

8. On this point, the Court is not persuaded by Murata's claim that Commerce is judicially estopped from arguing that independently-traded components are covered under the CMT Order because, Murata contends, Commerce previously asserted such components were excluded from the Order. (*See Murata* Tr. at 30–31; Pls.' Reply Br. at 12–15 (discussing government counsel's representation during oral argument in *Mitsubishi I*).) The doctrine of judicial estoppel generally provides " 'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.' " *Wang Lab., Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 358 (Fed.Cir.1992) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895)). The Court does not consider the comments made by government counsel at oral argument in *Mitsubishi I* sufficiently clear enough to constitute a "position in a legal proceeding" within the meaning of *Wang Lab.* (*See Murata* Tr. at 105–07, 125 (illustrating the spirited debate between respective counsel as to the interpretation of government counsel's statements during oral argument in *Mitsubishi I*).) Accordingly, the Court holds judicial estoppel does not apply in this instance.

9. Commerce's argument that *Alsthom Atlantique* precludes the Court from "requir[ing] Commerce to perform an additional 'class or kind' analysis . . . when the merchandise at issue is physically identical to the merchandise described in an antidumping duty order" is unavailing. In *Alsthom Atlantique*, the CAFC considered, *inter alia*, whether the CIT erred in remanding to determine whether "shunt reactors were within the class or kind of merchandise encompassed by large power transformers" as set out in the underlying antidumping determination by the De-

partment of Treasury (Treasury), the authority responsible for determining the applicable antidumping duties prior to the transfer of this power to ITA. *Alsthom Atlantique*, 4 Fed.Cir. (T) at 78, 787 F.2d at 571. The CAFC observed "Treasury's [Antidumping Proceeding] notice explicitly indicated that Treasury was investigating, and that its findings would apply to, all types of large power transformers including shunt reactors." *Id.* at 73, 787 F.2d at 567. In conclusion, the CAFC held: "In a [Tariff Act of 1930 § 751] review, the ITA does not have the power to substitute its judgment for Treasury's when Treasury has *specifically included* an item within its antidumping determination." *Id.* at 79, 787 F.2d at 571 (emphasis added). As discussed above, the evidence in this case is not dispositive whether ITA *specifically included* independently-traded components in its investigation and subsequent CMT Order. Therefore, the Court finds Commerce's reliance on *Alsthom Atlantique* misplaced.

10. In *Ericsson I*, the CIT examined, *inter alia*, plaintiffs' argument that Commerce unlawfully expanded the scope of the CMT Order to cover independently-traded subassemblies without performing the "same class or kind of merchandise" analysis. *Ericsson I*, 17 CIT at 582–83, 825 F.Supp. at 1094. Commerce opposed Murata's argument claiming "the relationship of the parties is not a basis for exclusion of a given producer's subassembly from the scope of the Order." *Id.* at 582, 825 F.Supp. at 1094. The CIT found:

The language of the *Final Determination* provides support for Murata's argument. In the *Final Determination*, Commerce concluded that "CMT subassemblies that are 'dedicated exclusively for use' in CMTs are the same 'class or kind' of merchandise as complete CMTs."

CIT's discussion in *Ericsson I* was in response to arguments challenging *Scope Ruling I*, which *Scope Ruling II* expressly relies upon for its analysis and conclusions, and given that similar arguments are raised here to challenge *Scope Ruling II*, the Court finds no reason to deviate from the analysis in *Ericsson I*.[11]

■ Accordingly, the Court holds the inclusion by Commerce of Murata's independently-traded components within the scope of the CMT Order *without* first applying the same factors Commerce applied to in-house subassemblies in the *Final Determination* to determine if the independently-traded components were within the "class or kind" of merchandise covered by the CMT Order is unsupported by substantial evidence on the record and is otherwise not in accordance with law. *Scope Ruling II* is remanded to Commerce to permit the agency to determine if Murata's independently-traded components are within the "class or kind" of merchandise

covered by the CMT Order. Commerce is directed on remand to apply the same factors it applied to in-house subassemblies in the *Final Determination* to those independently-traded components in Murata's scope ruling request. Commerce shall consider: (1) the general physical characteristics; (2) the expectations of the ultimate purchasers; (3) the channels of trade in which the product is sold; (4) the manner in which the product is advertised and displayed; and (5) the ultimate use of Murata's independently-traded components that Commerce seeks to include within the CMT Order.[12]

*B. Circuit Modules*

■ In *Scope Ruling II*, Commerce summarizes the findings of *Scope Ruling I* by stating, in relevant part, "*components that contribute to any CMT function are partially completed circuit modules and therefore are subassemblies covered by the order.*" *Scope Ruling II* at 2 (emphasis added).[13] Murata

---

50 Fed.Reg. at 45,448. Commerce then listed the factors upon which it based the determination that a new product was within the "class or kind" of merchandise described in a prior antidumping finding:

(1) General physical characteristics, (2) the expectations of the ultimate purchasers, (3) the channels of trade in which the product is sold, (4) the manner in which the product is advertised and displayed, and (5) the ultimate use of the merchandise in question. *Id.* A discussion of the application of these factors to CMT subassemblies followed in which Commerce made references to subassemblies manufactured in-house. The only reference to unrelated parties excluded them from the analysis: "While some CMT components may be purchased by CMT manufacturers from unrelated parties, the Department has reason to believe that such separately traded items may not meet the 'dedicated exclusively for use' criteria, and therefore would not be covered by the scope of any order." *Id.* *Id.* at 582–83, 825 F.Supp. at 1094. In conclusion, the CIT observed, "before Commerce concludes in further scope rulings based on the Order at issue that independently traded subassemblies are the 'same class or kind' of merchandise covered by the Order, it must first apply the same factors it applied to in-house subassemblies in the *Final Determination.*" *Id.* at 583, 825 F.Supp. at 1094.

11. This analysis in *Ericsson I* is arguably dicta as that decision did not turn upon the treatment of independently-traded components under the CMT Order. The Court continues to find, never-

theless, the reasoning in *Ericsson I* is persuasive on the point of requiring Commerce to apply the same factors it applied to in-house subassemblies in the *Final Determination* to those independently-traded components in Murata's scope ruling request. The issue of independently-traded components as discussed in *Ericsson I* was neither raised nor discussed in *Ericsson III*, where the CAFC reviewed the CIT's decision in *Ericsson I.*

12. The Court rejects Murata's claim that a remand is unnecessary because the "application of correct legal principles could lead to only one conclusion—that independent components are a different 'class or kind' of merchandise." The application of the *Diversified Products* analysis pursuant to its regulations is squarely within the province of Commerce.

13. In *Scope Ruling I*, Commerce clarified the definition of subassemblies covered by the Order.

Because of the difficulty presented in identifying each component to be covered by name, the Department constructed the definition of a subassembly in such a way as to capture within the scope of the order those circuit modules *which perform certain basic CMT functions....* Partially completed circuit modules cannot perform basic CMT functions themselves, but they do *contribute to the basic function of CMTs* and therefore, are included in the order. *Scope Ruling I* at 9 (emphasis added). Commerce noted, however, that its definition of a subassembly was not unlimited. Commerce claimed the five-dollar value requirement and the

claims the underscored language marks an unlawful expansion of the CMT Order. The Court disagrees. There is little doubt the scope ruling adds a gloss to the definition of subassemblies as expressed in the *Final Determination* and the CMT Order. The issue, however, is not whether the scope ruling employs language different from the *Final Determination* and the CMT Order, as it clearly does. The question is whether the deviation marks a clarification of the Order, which is within the province of Commerce, or is an unlawful expansion of the Order. For the reasons stated below, the Court holds the inclusion of the clarifying language in *Scope Ruling II* is a permissible clarification of the CMT Order.

Murata's concern that the clarification would allow Commerce to find that any component, no matter how small or minor, could be said to contribute to a CMT function, and thus be a "partially completed circuit module," is misplaced. The three-part definition of subassemblies adequately restricts the Order to include only those subassemblies that satisfy the definition. Such subassemblies are deemed to be the same "class or kind" of merchandise as the CMTs into which they ultimately are incorporated. *See Mitsubishi II*, 8 Fed.Cir. (T) at 52, 898 F.2d at 1584. In this way, those "small or minor components" that do not satisfy the three-part definition will not be found to be the same "class or kind" of merchandise as completed CMTs and will not fall within the Order. The Court finds Commerce's interpretation of what components constitute a "partially completed circuit module" is well-within the agency's discretion to adopt. *See id.* at 51, 898 F.2d at 1582–83 ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the [ITA] has found lies largely in the [ITA's] discretion.") (citation omitted).

Murata also argues that Commerce's "contributes to any CMT function" test is virtually identical to the "some of the functions

test" that Commerce erected in the remand determination following *Ericsson I*. In the remand, Commerce defined a "basic booster" as a device consisting of at least an amplifier and a duplexer and determined " 'a booster is a CMT transceiver since the basic booster provides certain necessary functions common to all CMTs, which typically reside in a traditional transceiver.' " *Ericsson GE Mobile Communications Inc. v. United States*, 18 CIT ——, 850 F.Supp. 34, 35 (1994) (citation omitted) (*Ericsson II*), aff'd in part, vacated in part, and remanded, 13 Fed.Cir. (T) ——, 60 F.3d 778 (1995) (*Ericsson III*). The CIT held Commerce unlawfully expanded the scope of the CMT Order by creating this new standard, which was not part of either the Order or the *Final Determination*. *Id.* at ——, 850 F.Supp. at 37. The CAFC, however, vacated the CIT's order in *Ericsson II*, and held that it is "permissible for the Department to define as a 'transceiver' any component of a CMT that performs some functions of a CMT transceiver." *Ericsson III*, 13 Fed.Cir. (T) at ——, 60 F.3d at 784. In the same way, this Court holds Commerce's interpretation of a "partially completed circuit module" to be a component that "contributes to any CMT function" is a permissible interpretation of the CMT Order. Accordingly, Commerce's clarification of the CMT Order as expressed in *Scope Ruling II* pertaining to the definition of a "partially completed circuit module" is sustained.

## V. Conclusion

The Court holds *Scope Ruling II* is vacated to the extent that it relies upon *Scope Ruling I* and unlawfully expands the CMT Order. *Scope Ruling II* is remanded in part and sustained in part. The Court holds the inclusion by Commerce of Murata's independently-traded components within the scope of the CMT Order without first applying the same factors Commerce applied to in-house subassemblies in the *Final Determination* to determine if the independently-traded com-

---

"dedicated exclusively for use" in CMTs requirement in the definition ensured that subassemblies used in non-CMT applications would not be included in the Order. *Id.* In conclusion, Commerce stated that a "subassembly which meets

these requirements *and which performs a function or contributes to the performance of a CMT function* fulfills the Department's definition of a covered CMT subassembly." *Id.* (emphasis added).

ponents were within the "class or kind" of merchandise covered by the CMT Order is unsupported by substantial evidence on the record and is otherwise not in accordance with law. *Scope Ruling II* is remanded to Commerce to permit the agency to determine if Murata's independently-traded components are within the "class or kind" of merchandise covered by the CMT Order. In its remand determination, Commerce is directed to consider: (1) the general physical characteristics; (2) the expectations of the ultimate purchasers; (3) the channels of trade in which the product is sold; (4) the manner in which the product is advertised and displayed; and (5) the ultimate use of Murata's independently-traded components that Commerce seeks to include within the CMT Order. *Scope Ruling II* is sustained in all other respects.

## ORDER

Upon consideration of plaintiffs' motion and defendant's opposition thereto, and upon due deliberation, it is hereby

**ORDERED** that *Final Scope Ruling on the Request By Murata for Clarification of the Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies From Japan* (date stamped Mar. 31, 1992) (*Scope Ruling II*), is vacated in part, remanded in part, and sustained in part, and it is further

**ORDERED** that *Scope Ruling II* is vacated to the extent it relies upon *Final Determination—Request By Murata Erie North America Inc., and Murata Manufacturing Co., Ltd., to Exclude Duplexers, Voltage Control Oscillators, and Active Filters from the Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies from Japan* (date stamped Aug. 30, 1991), and unlawfully expands *Antidumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan,* 50 Fed.Reg. 51,724 (Dep't Comm.1985) (CMT Order), and it is further

**ORDERED** that on remand Commerce is directed to consider: (1) the general physical characteristics; (2) the expectations of the ultimate purchasers; (3) the channels of trade in which the product is sold; (4) the manner in which the product is advertised and displayed; and (5) the ultimate use of

Murata's independently-traded components that Commerce seeks to include within the CMT Order; and it is further

**ORDERED** that *Scope Ruling II* is sustained in all other respects; and it is further

**ORDERED** that Commerce's remand results are due January 8, 1996. Any comments by Murata to the remand results are due January 29, 1996, and shall be limited to fifteen pages. Any rebuttal comments by Commerce are due February 12, 1996, and shall be limited to ten pages. In the interest of expediting a final judgment by this Court, absent extraordinary circumstances, no extensions of time will be granted for the remand results, comments, or rebuttal comments.