**ERICSSON GE MOBILE COMMUNICATIONS INC.; Murata Manufacturing Company, Ltd., et al.; Matsushita Electric Corporation of America, et al.; OKI Electric Industry Company, Ltd.; Mitsubishi Electric Corp., et al.; Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Motorola, Incorporated, Defendant–Intervenor.**

**MURATA MANUFACTURING COMPANY, LTD. and Murata Electronics North America, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 97–8.**
**Court Nos. 91–09–00703, 92–04–00272.**

United States Court of International Trade.

Jan. 22, 1997.

Sharretts, Paley, Carter & Blauvelt, P.C. (Gail T. Cumins, Ned H. Marshak), New York City, for plaintiff Ericsson GE Mobile Communications, Inc.

Weil, Gotshal & Manges (Jeffrey L. Kessler, Katherine A. Surprenant), New York City, for plaintiffs Matsushita Electric Corporation of America and Matsushita Communication Industrial Corporation of America.

Baker & McKenzie (B. Thomas Peele, III), Washington, D.C., for plaintiffs Mitsubishi Electric Corp. and Mitsubishi Consumer Electronics America, Inc.

Wilmer, Cutler & Pickering (Ronald I. Meltzer, Robert C. Cassidy, Jr.), Washington, D.C., for plaintiff OKI Electric Industry Co., Ltd.

Arnold & Porter (Richard A. Johnson, Michael T. Shor, Susan T. Morita), Washington, D.C., for plaintiffs Murata Manufacturing Co., Ltd., and Murata Electronics North America.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (A. David Lafer), Mark A. Barnett, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, Washington, D.C., for defendant.

Covington & Burling (Harvey M. Applebaum, David R. Grace) & Motorola, Inc. (Timothy A. Harr), Washington, D.C., for defendant-intervenor Motorola, Inc.

## OPINION

CARMAN, Chief Judge:

Plaintiffs, Murata Manufacturing Company, Ltd. and Murata Electronics North America, Incorporated[1] (collectively "Mura-

---

1. Murata Electronics North America was previously named Murata Erie North America, Incorporated. Murata independently produces and distributes a wide range of electronic com-

ta") and others (collectively "plaintiffs") challenge the Department of Commerce's ("Department" or "Commerce") remand decision in *Final Scope Remand—Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies from Japan: Murata Manufacturing Co., Ltd.* (dated June 17, 1996) (*Final Scope* Remand). Plaintiffs argue Murata's independently-traded cellular mobile telephone ("CMT") components should be found outside the scope of the antidumping duty order because they are not of the same "class or kind" of merchandise as the completed CMTs covered by the CMT antidumping duty order. Plaintiffs also argue Murata's independently-traded components are not "completed or partially completed circuit modules" within the meaning of the CMT antidumping duty order and are not "dedicated exclusively for use" in CMTs. Defendants respond Murata's independently-traded components fall within the scope of the CMT antidumping duty order because they meet the criteria for subassemblies as defined in the order. Defendant–Intervenor also argues Murata's components should be included within the scope of the antidumping duty order. This Court retained jurisdiction over this action during the pendency of Commerce's remand investigation, where the Court had jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988).

## I. BACKGROUND

### A. *The CMT Order*

In November 1984, Motorola, Incorporated ("Motorola"), an American manufacturer of cellular mobile telephones, petitioned Commerce, on behalf of the United States cellular mobile telephone industry, to initiate an antidumping investigation of CMTs manufactured in Japan, as well as all mobile transceivers or kits of components and subassemblies manufactured in Japan for use in the final assembly of CMTs. The subassemblies for which Motorola requested relief were identified as "multiple subassemblies or a large combined-function subassembly representing a substantial portion of a CMT or the CMT transceiver ... exported by Japanese manufacturers ... to a U.S. subsidiary." (Letter from Motorola to the Department Of Commerce of 2/21/95, at 6–7, *reprinted in* App. to Ericsson's Comm. in Opp'n to Remand, ("Ericsson's App.") at tab 2). Motorola's letter also noted Motorola "is aware of no instance in which a U.S. company is manufacturing CMT's using individual subassemblies purchased on the open market from different unrelated manufacturers in Japan, and the petition is not directed at such cases." *Id.* at 7.

Subsequent investigations by Commerce established that CMTs and CMT subassemblies from Japan were being sold in the United States at less than fair value ("LTFV"). *See Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 45,447 (Dep't Comm.1985) (*final determ.*). Additionally, the United States International Trade Commission ("ITC") determined sales of those products were materially injuring a United States industry. *See Cellular Mobile Telephones and Subassemblies Thereof From Japan,* USITC Pub. 1786, Inv. No. 731–TA–207 (Final) (Dec. 1985) (*ITC Final Report*). Accordingly, Commerce issued an antidumping order encompassing CMTs, CMT transceivers, CMT control units, and certain subassemblies thereof. *See Antidumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan,* 50 Fed.Reg. 51,724 (Dep't Comm.1985) ("*CMT Order*").

ponents to original equipment manufacturers—including U.S. and Japanese cellular mobile telephones ("CMT") producers—but does not produce CMTs. (Murata's Comm. in Opp'n to Remand ("Murata's Comm.") at 1.) Murata was not a party to Commerce's less than fair value investigation, as only Japanese producers that manufacture complete CMTs were investigated. *See Ericsson GE Mobile Communications Inc. v. United States,* 17 CIT 571, 575, 825 F.Supp. 1085, 1088 (1993) (*Ericsson I*), *aff'd in part,* vacated in part, and remanded, 60 F.3d 778 (1995) (*Ericsson III*). Ericsson is one of Murata's customers in the United States and manufactures CMTs in the U.S. using parts and components produced by Ericsson domestically, as well as parts and components sourced by Ericsson from unrelated vendors. (Murata's Feb. 26, 1996 Comm. Concerning Remand Proceedings at 5) (*reprinted* in App. to Murata's Comm. in Opp'n to Remand).

Commerce defined the scope of the term "subassemblies" in the *CMT Order* as follows:

> Subassemblies are any *completed or partially completed* circuit modules, the value of which is *equal to or greater than five dollars,* and which are [sic] *dedicated exclusively for use* in CMT transceivers or control units. The term "dedicated exclusively for use" only encompasses those subassemblies that are specifically designed for use in CMTs, and could not be used, absent alteration, in a non-CMT device.

*CMT Order,* 50 Fed.Reg. at 51,725 (emphasis added). Thus, the *CMT Order* defined a subassembly falling within the scope of the *CMT Order* as one satisfying a three-part definition: the subassembly (1) must be a completed or partially completed circuit module; (2) must have a value equal to or greater than five dollars; and (3) must be dedicated exclusively for use in CMT transceivers or control units, only encompassing those subassemblies that are specifically designed for use in CMTs, and could not be used, absent alteration, in a non-CMT device. Commerce explained an importer would have to file a declaration with the United States Customs Service ("Customs") to the effect that a particular CMT subassembly was not dedicated exclusively for use in CMTs or that the dollar value was less than five dollars if it wished it to be excluded from the *CMT Order. CMT Order,* 50 Fed.Reg. at 51,725. The scope of the *CMT Order* has been challenged in other proceedings before this Court and the Court of Appeals for the Federal Circuit ("CAFC").[2] Parts (1) and (3) of the three-part definition are at issue in this decision.

### B. Scope Ruling I

On January 4, 1986, Murata filed a request for a scope ruling seeking a determination that eleven specific components [3] it imported into the United States were not subassemblies as defined by the *CMT Order,* and thus outside the scope of the *CMT Order.* Murata argued the components were not within the *CMT Order's* scope because: (1) Murata was not a CMT manufacturer; (2) Murata's components were not subassemblies as defined by the *CMT Order,* but were independently-traded parts, resold on the open market in the United States to unrelated CMT manufacturers, such as Ericsson, for incorporation into CMTs; and (3) Murata's components were not "dedicated exclusively for use" in CMTs. In January 1991, Commerce requested updated comments from interested parties regarding Murata's scope ruling request. On August 30, 1991, Commerce rejected Murata's claims and determined Murata's eleven components were within the scope of the *CMT Order. See* International Trade Administration, United States Department of Commerce: *Final Determination—Request By Murata Erie North America Inc., and Murata Manufacturing Co., Ltd., to Exclude Duplexers, Voltage Control Oscillators, and Active Filters from the Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies from Japan* at 18–19 (date stamped Aug. 30, 1991) (*Scope Ruling I* ).

---

**2.** *See, e.g., Mitsubishi Elec. Corp. v. United States,* 16 CIT 730, 802 F.Supp. 455 (1992) (*Mitsubishi III* ), *aff'd,* 11 F.3d 1070 (1993); *Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 700 F.Supp. 538 (1988) (*Mitsubishi I* ), *aff'd,* 8 Fed. Cir. (T) 45, 898 F.2d 1577 (1990) (*Mitsubishi II* ). In *Mitsubishi I,* plaintiffs challenged, *inter alia,* Commerce's decision in the *Final Determination* to include CMT subassemblies within the scope of the *CMT Order.* The Court of International Trade upheld Commerce's determination to include discrete CMT subassemblies within the scope of the *Order* as a means to prevent circumvention of the *Order* through the importation of major CMT subassemblies. The Court of Appeals for the Federal Circuit ("CAFC") affirmed.

In *Mitsubishi III,* this Court held Commerce's 1991 scope ruling unlawfully expanded the coverage of the *CMT Order* by requiring importers to prove their CMT subassemblies were actually employed in the production of non-CMT devices in the United States to avoid having the subassemblies deemed "dedicated exclusively for use" in CMT transceivers or control units. *Mitsubishi III,* 16 CIT at 737–38, 802 F.Supp. at 461. The Court found no language in the *CMT Order* requiring such a showing and therefore held this new standard was not sustainable as a mere clarification of the *CMT Order. Id.* The CAFC affirmed.

**3.** Murata's request covered the following eleven components: one triplexer, two duplexers, two voltage control oscillators ("VCOs"), four active filters and two single filters.

Murata challenged *Scope Ruling I* in a consolidated action before this Court. Plaintiffs, including Murata, argued *Scope Ruling I* improperly altered the scope of the *CMT Order* in a manner inconsistent with its original terms. This Court agreed and held *Scope Ruling I* unlawfully expanded the scope of the *CMT Order. See Ericsson GE Mobile Communications Inc. v. United States,* 17 CIT 571, 578–79, 825 F.Supp. 1085, 1091 (1993) (*Ericsson I* ), *aff'd in part, vacated in part, and remanded,* 60 F.3d 778 (1995) (*Ericsson III* ). Specifically, this Court held in *Ericsson I* that Commerce impermissibly expanded the scope of the original *CMT Order* by changing the third element of its definition of covered subassemblies, the "dedicated exclusively for use" element, to require importers to show: (1) their products are "actually used" in a non-CMT product; (2) the actual alternative use occurs in the United States subsequent to importation; and (3) the actual use in the United States is commercially available. *Ericsson I,* 17 CIT at 578–81, 825 F.Supp. at 1091–93. The Court held "these requirements are not implicit in the Order, but instead amount to an expansion of the scope of the CMT Order." *Ericsson I,* 17 CIT at 583, 825 F.Supp. at 1091. Accordingly, the Court vacated *Scope Ruling I. Ericsson I,* 17 CIT at 583, 825 F.Supp. at 1094.

While this Court found Commerce unlawfully expanded the "dedicated exclusively for use" element of the definition of subassemblies covered by the *CMT Order* in *Ericsson I,* the Court did not reach plaintiffs' argument that Commerce also had abandoned the first part of the definition—that subassemblies falling within the scope of the *Order* must be "completed or partially completed circuit modules"—and substituted a new test requiring inquiry as to whether the component was necessary to perform a function of the CMT or contribute to a function neces-

sary for a CMT. *Ericsson I,* 17 CIT at 578, 825 F.Supp. at 1091.

Additionally, this Court in *Ericsson I* did consider plaintiffs' argument that Commerce unlawfully expanded the scope of the *CMT Order* to cover independently-traded subassemblies without first determining whether independently-traded components were within the "class or kind" of merchandise covered by the *Order. See Ericsson I,* 17 CIT at 582–83, 825 F.Supp. at 1094. Plaintiffs argued Commerce limited its original analysis to related in-house subassemblies in the *Final Determination,* and thus did not decide the independently-traded components issue. *See Ericsson I,* 17 CIT at 582, 825 F.Supp. at 1094. The Court found the language in the *Final Determination* supported plaintiffs' arguments, stating

> before Commerce concludes in further scope rulings based on the Order at issue that independently traded subassemblies are the "same class or kind" of merchandise covered by the Order, it must first apply the same factors it applied to in-house subassemblies in the *Final Determination.*

*Ericsson I,* 17 CIT at 583, 825 F.Supp. at 1094.[4]

### C. Scope Ruling II

In January 1992, prior to this Court's decision in *Ericsson I,* Murata initiated a second scope request asking Commerce to find Murata's electronic components outside the scope of the *CMT Order* on the grounds that

> (i) Murata's independently-traded components are not the same "class or kind" of merchandise as complete CMTs, (ii) Murata's components are not "circuit modules," and therefore not "subassemblies" within the meaning of the *CMT Order,* and (iii) Murata's components as a whole are not "dedicated exclusively for use" in CMT transceivers or control units.

---

4. In *Ericsson III,* the CAFC affirmed this Court's decision in *Ericsson I* to vacate the scope ruling and agreed Commerce impermissibly expanded the scope of the *CMT Order. Ericsson III,* 60 F.3d at 779. The CAFC also held, however, this Court should not have entered final judgment for plaintiffs on the record before the it. *Ericsson III,* 60 F.3d at 783. "[T]he Commerce Department should be given another opportunity to interpret the order at issue in this case," the CAFC explained. *Id.* Thus, the CAFC reversed this Court's decision in part and remanded the case to permit Commerce "to interpret the order according to any of its legally acceptable options." *Id.*

*Murata Manufacturing Co., Ltd. and Murata Electronics North America, Inc. v. United States*, 908 F.Supp. 978, 981 (CIT 1995) (*Murata*) (quoting Pls.' Br. in Supp. of Mot. for J. Upon Agency R. ("Pls.' Br.") at 13 (footnote omitted)) On March 31, 1992, Commerce ruled on Murata's second scope request by expressly relying on its findings in *Scope Ruling I* and responding that Murata " 'has provided no new information to support its argument that its components should be excluded from the order. Based on this, we determine that reconsideration of the decision is unwarranted and a scope inquiry is unnecessary.'" *Murata*, 908 F.Supp. at 981 (quoting *Final Scope Ruling on the Request By Murata for Clarification of the Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies From Japan* (date stamped Mar. 31, 1992) (*Scope Ruling II*)). On December 9, 1994, plaintiffs moved for judgment upon the agency record, appealing the second scope determination.

On November 22, 1995, this Court reviewed Commerce's determination with respect to Murata's second request for a scope inquiry and held

> the inclusion by Commerce of Murata's independently-traded components within the scope of the CMT Order without first applying the same factors Commerce applied to in-house subassemblies in the *Final Determination* to determine if the independently-traded components were within the "class or kind" of merchandise covered by the CMT Order is unsupported by substantial evidence on the record and is otherwise not in accordance with law.[5]

*Murata*, 908 F.Supp. at 988–89. Consistent with its decision in *Ericsson I*, this Court ruled in *Murata* that Commerce improperly concluded Murata's independently-traded subassemblies were within the "class or kind" or merchandise covered by the *CMT Order*. The Court held that prior to reaching such a determination, Commerce must apply the same factors it used in analyzing in-house subassemblies in the *Final Determination* to the independently-traded components at issue in Murata's scope ruling request. Specifically, the Court held Commerce must consider: (1) the independently-traded components' general physical characteristics; (2) the expectations of the ultimate purchasers; (3) the channels of trade in which the independently-traded components were sold; (4) the manner in which the independently-traded components were advertised and displayed; and (5) the ultimate use of Murata's independently-traded components that Commerce sought to include within the *CMT Order* (collectively the *"Diversified Products* criteria"). *Murata*, 908 F.Supp. at 987.[6]

---

**5.** In *Diversified Prods. Corp. v. United States*, 6 CIT 155, 162–63, 572 F.Supp. 883, 889–90 (1983), this Court reviewed the International Trade Administration's ("ITA") application of certain criteria to determine if the merchandise under review belonged to the "class or kind" of merchandise encompassed in the dumping finding. The ITA considered: "the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels of trade in which the merchandise moves, the ultimate use of the merchandise, and cost." *Id.* at 162, 572 F.Supp. at 889 (citations omitted). Upon review of the ITA's application of these factors, the Court upheld the ITA's "same class or kind" determination. All of these factors, except cost, have been codified at 19 C.F.R. § 353.29(i)(2)(i)-(iv) since 1990 as appropriate criteria in determining whether a new product is within the "class or kind" of merchandise described in a prior antidumping finding when an examination of the petition, the initial investigation and the ITA and International Trade Commission ("ITC") determinations is not dispositive on the issue.

In evaluating the purpose of the *Diversified Products* test, Murata's comments on the *Final Scope Remand* contend

> [t]he purpose of the antidumping law is to protect U.S. manufacturers from competitive injury resulting from the importation of a "class or kind" of foreign merchandise. 19 U.S.C. § 1673. The "class or kind" of foreign merchandise thus must be limited to substitutable, competitive goods capable of affecting prices or sales of the U.S. manufacturers claiming injury. Thus, each of the *Diversified Products* criteria focuses on substitutability and competition. Goods that are substitutable and compete with one another will share common physical characteristics, be sold in the same channels of trade, have comparable uses, satisfy the same customer expectations, and be advertised and displayed in a similar fashion.

(Murata's Comm. at 21–22 (footnote omitted).)

**6.** In the *Final Determination*, Commerce responded to arguments that the Department had no authority to include discrete subassemblies within the scope of the investigation because they were not the same "class or kind" of merchan-

On December 18, 1995, this Court also remanded the *Ericsson* litigation. *See Ericsson G.E. Mobile Communications Inc., v. United States,* Court No. 91–09–00703 (CIT Dec. 18, 1995) (order remanding proceeding to the Department of Commerce) (*Ericsson Remand* ). In this remand order, the Court directed Commerce to apply the *Diversified Products* criteria to Murata's eleven independently-traded components subject to the underlying scope determination, and thereby determine whether they were in the same "class or kind" of merchandise as that covered by the *CMT Order.* Additionally, the Court ordered the Department to review its determination that the eleven components were "circuit modules" within the meaning of the *CMT Order.* Finally, the Court ordered Commerce to reconsider and reapply the "dedicated exclusively for use" test contained in the *CMT Order* with respect to nine components that were the subject of *Ericsson I,* in light of the CAFC's opinion in *Ericsson III* and those portions of the Court's opinion in *Ericsson I,* if any, which were not appealed.

### D. The Remand Determination

Following discussions among all parties to the litigation and this Court, the two cases were consolidated and Commerce issued a single, consolidated remand determination. In the course of its remand investigation, Commerce requested and received initial comments and factual information from interested parties, as well as rebuttal comments. Commerce issued its preliminary remand results in two parts. It issued preliminary remand results of its *Diversified Products* analysis on May 14, 1996, and the second portion of its preliminary remand results, concerning the "circuit module" and "dedicated exclusively for use" issues on May 20, 1996. Commerce issued its final remand results on June 17, 1996.

In reaching its determination, Commerce compared Murata's independently-traded subassemblies with in-house subassemblies to determine whether the independently-traded components were a different "class or kind" of merchandise than that covered by the *CMT Order. Final Scope Remand* at 4. Commerce found Murata's independently-traded components "dedicated exclusively for use" in CMTs were the same "class or kind" of merchandise as that covered by the *CMT Order.* Murata's components which were not "dedicated exclusively for use" in CMTs were found to fall outside the scope of the *CMT Order.* The Department further determined Murata's eleven components at issue in the *Ericsson Remand* were "circuit modules" within the meaning of the *CMT Order.* With respect to the issue of whether the nine subassemblies were "dedicated exclusively for use" in CMTs, the Department concluded four of the nine components were "dedicated exclusively for use" in CMTs and, therefore, within the scope of the *CMT Order.* Commerce concluded the remaining five subassemblies were not "dedicated exclusively for use" in CMTs and therefore were not within the scope of the *CMT Order.*

### II. CONTENTIONS OF THE PARTIES

### A. Plaintiffs

### (1) Diversified Products Analysis

Plaintiffs argue Murata is not a CMT producer nor related to a CMT producer and that Murata sells its independently-traded subassemblies to CMT producers in arms-length transactions. As a result, Murata claims its subassemblies are not the same "class or kind" of merchandise as the CMTs covered by the *CMT Order.*

dise as completed CMTs. In the *Final Determination,* Commerce found subassemblies "dedicated exclusively for use" in CMTs were covered by the *CMT Order.* Commerce brought subassemblies within the scope of the investigation through a *Diversified Products* analysis that applied the five factors to in-house subassemblies, on the one hand, and to complete CMTs found by Commerce to have been dumped, on the other hand. It found, for example, that the ultimate purchas-

ers and users of the CMT subassemblies are the same as for the complete CMTs. It also found that while subassemblies and complete CMTs have different physical characteristics, both CMT subassemblies and complete CMTs move in the same channels of trade. Commerce concluded CMT subassemblies that are dedicated exclusively for use in CMTs are the same "class or kind" of merchandise as complete CMTs. *Final Determination,* 50 Fed.Reg. at 45,448.

Plaintiffs argue Commerce erroneously applied the *Diversified Products* criteria by comparing Murata's independently-traded components to in-house subassemblies and not to complete CMTs which Commerce used in performing its original antidumping pricing comparison. Plaintiffs claim only merchandise of the same "class or kind" as complete CMTs can properly be brought within the scope of the *CMT Order*. According to plaintiffs, when CMTs are compared to Murata's independently-traded components under each of the *Diversified Products* factors, Commerce's determination is not supported by substantial evidence on the record and is not otherwise in accordance with law. Murata adds Commerce's determination cannot be sustained "even on the basis of its own limited comparison with in-house subassemblies." (Murata's Comm. in Opp'n to Remand ("Murata's Comm.") at 6.)

Addressing each element of the *Diversified Products* analysis specifically, Murata first argues its independently-traded components share no physical characteristics with complete CMTs. Second, Murata contends that unlike in-house subassemblies, the ultimate purchaser of Murata's independently-traded subassembly is not a consumer purchasing a CMT but rather an Original Equipment Manager ("OEM")—the first unrelated party to buy Murata components other than for resale—whose expectations differ from those individuals purchasing CMTs. Third, Murata argues only in-house subassemblies move in the same channels of trade as do complete CMTs. Murata asserts its independently-traded components are sold on the open market and to OEMs, and, therefore, the channels of trade for Murata's independently-traded components are separate and distinct from complete CMTs, whose purchasers have no access to the market served by Murata. Fourth, plaintiffs argue Murata's independently-traded components are not advertised or displayed as complete CMTs, but rather as separate components. Fifth, plaintiffs maintain the ultimate purchasers of its components are OEMs and therefore, the ultimate use of its components is in the manufacture of CMTs, not as a CMT.

Finally, Murata points to the general purposes of the antidumping laws in the United States and argues its independently-traded components do not compete with and are not substitutable for CMTs. Murata asserts independently-traded components enter the stream of commerce in the United States as components, not as finished CMTs, "and pose no competitive threat to U.S. CMT manufacturing operations.... The *LTFV Determination* itself recognized that subassemblies having no adverse competitive impact on U.S. CMT manufacturers should be excluded—a point Commerce completely overlooks." (Murata's Comm. at 22–23.) Plaintiffs contend Commerce's position contravenes the intent of the *CMT Order*, which was designed to protect the commercial interests of domestic CMT manufacturers such as Ericsson. According to Murata, "Commerce's new-found belief that the difference between the sale of components among unrelated parties and the transfer of a subassembly in-house by a CMT manufacturer is insignificant is controverted by the purpose of the antidumping law and the *CMT Order* and is thus unreasonable." (Murata's Comm. at 14.) Plaintiffs conclude by asserting a determination in this case that Murata's independently-traded components are the same "class or kind" of merchandise as finished CMTs would serve as a precedent to expand the scope of all existing antidumping orders covering finished goods to include their independently-traded constituent components.

(2) Circuit Module Analysis

Murata argues Commerce should reconsider its "circuit module" analysis and find Murata's independently-traded components are not "completed or partially completed circuit modules" within the meaning of the *CMT Order*. Plaintiffs explain Commerce and the ITC deliberately used the term "circuit module" to restrict the scope of the *CMT Order* to major subassemblies which could be easily replaced and snapped together to form a complete CMT, and did not intend to include the discrete electronic components at issue. Murata contends the "contributes to any CMT function" test applied by Commerce in determining whether an electronic component constitutes a circuit module is an unrea-

sonable interpretation of the term "circuit module," and is unsupported by record evidence or any accepted meaning of the term within the electronics industry.

### (3) Dedicated Exclusively For Use Issue

Plaintiffs argue Commerce should clarify the *CMT Order*'s phrase "could ... be used" to mean "potential use" and not actual use in a non-CMT device. Murata claims the CAFC's opinion in *Ericsson III* does not require there be demonstrated actual use in an existing non-CMT product to hold the product outside the scope of the *CMT Order*, but only that it would be reasonable to "require some existing use to which the product *could realistically* be put." (Murata's Comm. at 27 (quoting *Ericsson III*, 60 F.3d at 782) (emphasis partially omitted).) Murata contends a requirement of actual demonstrated use is inconsistent with the *CMT Order*'s requirement that importers declare upon its entry that merchandise is not dedicated exclusively for use in CMT transceivers or control units. Murata claims at the time of importation it has no way of knowing all of the ways in which its customers will actually use the components. The only knowledge Murata has is of the component's potential use. (Murata's Comm. at 28.) Finally, plaintiffs argue if the Court determines an "actual use" standard is the applicable test, the decision should only be applied prospectively, "since a bright line actual use test constitutes a new interpretation of the scope of the CMT order." (Ericsson's Comm. in Opp'n to Remand ("Ericsson's Comm.") at 23.)

### B. Defendant & Defendant–Intervenor

### (1) *Diversified Products* Analysis

The United States and Motorola (collectively "defendants") argue the correct question under the *Diversified Products* analysis is whether Murata's subassemblies differ from the in-house subassemblies referred to in the *CMT Order*, and not whether they share characteristics with complete CMTs.

First, Motorola argues Murata presented no evidence or argument that the general physical characteristics of its independently-traded components are significantly different from the general physical characteristics of in-house assemblies. Second, Motorola contends the ultimate purchaser of a CMT subassembly is a consumer who buys the CMT, even if the subassembly is first acquired and assembled into a complete CMT by an intermediate U.S. entity. Third, Motorola maintains even if CMT subassembly manufacturers are distinct from CMT manufacturers, the two do not necessarily conduct business in different channels of trade. Fourth, Motorola argues the advertising of Murata's independently-traded components should be compared with the advertising of in-house subassemblies. With regard to the *Diversified Products* ultimate use criteria, Motorola contends the Murata components have a special CMT-oriented design and therefore the ultimate use of each independently-traded Murata component is, just as with in-house subassemblies, as part of a CMT.

### (2) Circuit Module Analysis

Motorola argues Commerce determined in *Murata* that Murata's independently-traded components are "subassemblies" covered by the *CMT Order*. Motorola quotes Commerce as observing, " essentially this *same* determination, involving the *same* types of products from the *same* producer, has already been ... upheld." (Motorola's Comm. in Supp. of Remand ("Motorola's Comm.") at 13.) Motorola then concludes "[t]herefore, there was no reason for the Department to change its previous rulings on this issue. Similarly there is no reason for this Court to change its prior opinion." (*Id.* at 13–14.) Motorola also argues "there is more than ample basis in the record" to conclude Murata's independently-traded components are "circuit modules" and therefore "subassemblies" "as that term is intended under the [CMT] Order." (*Id.* at 14). Motorola maintains Commerce correctly relied on the final determination's identification of VCOs and duplexers as CMT "subassemblies." *Id.*

In response to Murata's arguments about industry definition and usage, the United States asserts Commerce's *Final Scope Remand* is consistent with the regulations and Commerce's practice that "the scope of an

order is to be interpreted in light of the petition, the investigation, and the determinations of the Department and the [ITC]. Where those sources suggest an interpretation of language in the scope which is at odds with how that language is used by the industry (e.g., as a limited term of art), the industry usage may not be controlling." (Def.'s Reply to Comm. on Remand (Def.'s Comm.") at 24–25 (citations and footnote omitted).) Motorola also notes "[g]iven that the goal of the CMT Order was not to impose complex technical requirements on the definition of 'subassembly,' there is no validity to Plaintiffs' arguments that these products should be excluded because they do not meet some narrower definition of 'module.'" (Motorola's Comm. at 15). Finally, Motorola argues even if the definition of a circuit module chosen by plaintiffs is used, "these products meet that definition." (*Id.* at 16)

### (3) Dedicated Exclusively For Use Issue

Motorola argues Commerce was justified in relying on Murata's failure to demonstrate some of its independently-traded components were used in non-CMT applications in concluding those components were dedicated exclusively for use in CMTs. (Motorola's Comm. at 18.) Motorola notes the Federal Circuit rejected this Court's interpretation of the phrase "could be used"to include only potential use, concluding Commerce could adopt any other lawful interpretation, including an actual use standard. (*Id.*) Motorola asserts the CAFC's opinion in *Ericsson III* recognized the potential for circumvention of the *CMT Order*, should the "potential use" test become the standard, and found the Department's actual use standard to be reasonable. Motorola also argues Commerce's reliance on an "actual use" test is

> the *only* approach that: (1) provides the Customs Service, the Department and the parties with an administratable, predictable, and meaningful basis for determination, (2) allows the CMT Order to be effective against subassemblies that are dedicated for use in CMTs and have no other reasonable commercially viable use, *and* (3) at the same time properly allows for exclusion of generic electronic subas-

semblies that are sold for multiple, non-CMT applications.

(*Id* at 17.) Finally, defendant argues the actual use standard, if approved by this Court, should not only be limited to prospective application, as that "would have the effect of preventing the application of this standard to the very products and entries which gave rise to the development of the standard." (Def.'s Comm. at 20.)

### III. STANDARD OF REVIEW

■ In an action challenging Commerce's determination that imported merchandise is covered by an existing antidumping duty order, this Court will find unlawful any challenged determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987).

### IV. DISCUSSION

■ "It is well established ... the [International Trade Administration] has the authority to clarify the scope of its antidumping duty orders. Commerce, however, may not expand the scope of such orders beyond the merchandise encompassed by the final less than fair value determinations." *Mitsubishi III,* 16 CIT at 733–34, 802 F.Supp. at 458 (citations omitted). Although Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders ... it may not change them." *Ericsson III,* 60 F.3d at 782 (citations omitted). The question before this Court is whether Commerce's remand determination impermissibly expands the scope of the *CMT Order* and is, therefore, unsupported by substantial evidence and otherwise not in accordance with law.

### A. *Diversified Products* Analysis

#### (1) Mode of Comparison

In determining whether a particular product is within the "class or kind" of merchan-

dise described in an existing antidumping duty order, 19 C.F.R. § 353.29(i)(1) states Commerce is to take into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary and the Commission." 19 C.F.R. § 353.29(i)(1) (1994). When the above criteria are not dispositive, the regulations instruct Commerce to further consider:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product; and

(iv) The channels of trade.

19 C.F.R. § 353.29(i)(2)(i)-(iv) (1994).[7] *See Nitta Indus. Corp.,v. United States,* 997 F.2d 1459, 1461 (Fed.Cir.1993) (citations omitted) ("[I]n the event that [the ITA] cannot make a scope determination based on this information, it then looks to the *Diversified Products* criteria. Such an analysis finds support in the law. . . .").

Prior to ordering the remand in this matter, this Court examined the descriptions of the merchandise in the petition, the initial investigation, the determinations of the ITA and the ITC and the resulting antidumping duty order to determine whether independently-traded components were within the "class or kind" of merchandise described in the *CMT Order. See Murata,* 908 F.Supp. at 985–87. In the *Murata* opinion, this Court noted Commerce's investigation initially appeared to include only those subassemblies moving between related parties, "presumably because circumvention of a CMT Order would seem especially likely in such cases." *Murata,* 908 F.Supp. at 985. The opinion continued, noting

[n]evertheless, there appears to be little on the record that would justify excluding subassemblies that meet the three-part definition from being within the scope of

the Order merely because they were independently-traded. . . .

. . . [T]he Court finds it is not clear if Commerce meant to include independently-traded components in its investigation and subsequent Order. This is not to say that independently-traded components are not covered by the CMT Order.

*Murata,* 908 F.Supp. at 985–86.[8] Because the evidence from the petition, from the initial investigation, from the determinations of the ITA and ITC and the resulting antidumping duty order were not dispositive on the issue of whether Murata's independently-traded components were included within the scope of the *CMT Order,* this Court remanded *Scope Ruling II* to Commerce and ordered it to determine if Murata's independently-traded components are within the "class or kind" of merchandise covered by the *CMT Order* by applying the *Diversified Products* criteria. *See Murata,* 908 F.Supp. at 987.

Following remand, Commerce performed a *Diversified Products* analysis on Murata's independently-traded components, comparing them with in-house subassemblies in order to determine whether there were differences between the two sufficient to establish the independently-traded components as a different "class or kind" of merchandise than that covered by the *CMT Order. Final Scope Remand* at 3. Commerce limited its analysis to those independently-traded components that are "dedicated exclusively for use" in CMTs because "the CMT Order explicitly provides that the scope of the order is limited to subassemblies that are dedicated exclusively for use in CMTs. Components which are not dedicated exclusively for use in CMTs are not within the scope of the order" regardless of whether they meet the *Diversified Products* criteria. *Final Scope Remand* at 4.

---

**7.** These criteria are known as the *Diversified Products* criteria. *See, supra,* footnote 5.

**8.** In the *Final Determination,* with respect to the independently-traded components, Commerce stated "[w]hile some CMT subassemblies may be purchased by CMT manufacturers from unrelated parties, the Department has reason to believe

that such separately traded items may not meet the 'dedicated exclusively for use' criterion, and therefore might not be covered by the scope of any order." 50 Fed.Reg. at 45,451. Thus, the *Final Determination* does not explain how the Department would treat components that were "dedicated exclusively for use" in CMTs.

Plaintiffs argue, however, Commerce denied them due process by failing to compare independently-traded subassemblies with complete CMTs as it did in the *Final Determination*, "because the Department indicated to Murata that it would perform the same analysis as it did in the *Final Determination*, and then, without notice, performed a different analysis." (Murata's Comm. at 9.) Murata maintains

> Commerce erred as a matter of law, and departed from the Court's express instruction, when it performed a different analysis for Murata's components than the analysis it performed for in-house subassemblies in the [*Final*] *Determination*. . . .
>
> . . . .
>
> The limitation of the comparison solely to in-house subassemblies results in unreasonable bootstrapping, and an unlawful expansion of the *CMT Order*. . . .
>
> . . . Commerce must always return to the original products for which it performed its dumping analysis. By failing to do so here, Commerce erred as a matter of law. . . .
>
> . . . .
>
> . . . Commerce has no legal basis for limiting its *Diversified Products* analysis to a subset of that class or kind of foreign merchandise.

(*Id.* at 4–6.) Motorola disagrees, arguing

> [T]he task before the Department was to decide if Murata's products were in the class of merchandise covered by the CMT Order. That class of merchandise specifically includes "subassemblies."
>
> . . . [T]his antidumping proceeding has always covered CMT subassemblies just as fully and directly as it covers complete CMTs. Such subassemblies were covered in the antidumping petition. They were in the title of the petition and a focus of the case from the outset. . . . [S]ubassemblies were an original target of the antidumping proceeding.

(Motorola's Comm. at 5–6 (emphasis omitted).) Commerce evaluated both arguments and held the question under *Diversified Products* was whether Murata's subassemblies were different from those subassem-

blies referred to in the *CMT Order*. Commerce's remand determination stated this issue

> can only be reached by comparing the subassemblies that are the subject of this scope inquiry to in-house subassemblies that are clearly covered by the order. Mitsubishi's statement that the comparison of Murata's independently traded components to in-house subassemblies would unfairly expand the scope of the order because in-house subassemblies were not included in the investigation is incorrect. In-house subassemblies were included in the scope of the investigation. . . .

*Final Scope Remand* at 6.

■ This Court finds Motorola's arguments persuasive and Commerce's analysis proper. The Court's remand in *Murata* directed the Department to apply the same factors to the independently-traded components as it applied to in-house subassemblies. The Department followed the Court's mandate. This Court did not specifically direct Commerce to compare independently-traded components with complete CMTs. As the CAFC stated in *Ericsson III*, Commerce has "broad discretion" to "administer the antidumping duty program." *Ericsson III*, 60 F.3d at 783. Accordingly, this Court finds Commerce's comparison is supported by substantial evidence on the record and is otherwise in accordance with law.

The Court will now turn to the question of whether Commerce's application of each of the *Diversified Products* factors is supported by substantial evidence on the record and is otherwise in accordance with law.

### (2) *Diversified Products* Criteria

#### a. *General Physical Characteristics*

■ The first *Diversified Products* criteria at issue is whether there are differences in the physical characteristics of Murata's independently-traded components and in-house subassemblies. Murata argues the *CMT Order*'s lack of any clear physical description defining the subassemblies intended to be covered makes it impossible to compare Murata's independently-traded components with in-house subassemblies. After examin-

ing the information placed on the record by Murata, consisting of the name and a general description of each Murata subassembly at issue, Commerce disagreed with Murata's position, stating

> given that Murata uses the same terms to describe its components (for example; duplexers) and the evidence on the record does not suggest that Murata's components perform different functions from similarly identified in-house subassemblies, we cannot conclude that the general physical characteristics of Murata's components differ significantly from those of in-house subassemblies.

*Final Scope Remand* at 7.

Murata, while presumably knowing the facts pertaining to the physical characteristics of its independently-traded components, failed to provide sufficient evidence to convince Commerce that the general physical characteristics of its independently-traded components are significantly different from the general physical characteristics of in-house subassemblies. This Court is not persuaded that Murata has produced sufficient evidence to justify this Court in overturning Commerce. This Court finds the Department properly concluded Murata's subassemblies are physically similar to the subassemblies covered by the scope of the *CMT Order.* Accordingly, this Court holds Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law.

### b. The Expectations of the Ultimate Purchasers

Murata argues the ultimate purchasers of its subassemblies are not CMT consumers but rather the Original Equipment Managers, the first unrelated purchasers to buy the goods other than for resale. Murata claims its products are intermediate goods, separately sold to unrelated purchasers and used in further manufacture, unlike complete CMTs which are purchased by consumers with different expectations.[9] Motorola, however, contends OEMs are simply intermediate purchasers, while the ultimate purchasers of Murata's components are still CMT consumers.

On remand, the Department reasoned "[i]n a *Diversified Products* analysis, which calls for analysis of the expectations of the *ultimate* purchasers, the sale to the first unrelated party does not necessarily define the ultimate purchaser." *Final Scope Remand* at 9. Commerce determined the expectations of the ultimate purchasers of CMTs and Murata's subassemblies are the same, because Murata's "dedicated-exclusively-for-use-in-CMTs" subassemblies by definition are used only in complete CMTs and by definition could not be used in a non-CMT device. Commerce noted that although Murata claimed its components were sold to a variety of unrelated OEMs for use in a wide variety of electronic components, "Murata provided no evidence of such widely varied uses for the components that are dedicated exclusively for use in CMTs." *Final Scope Remand* at 10 n.2. Therefore, according to Commerce, "the purchase of the CMT subassembly by

9. In support of its position, Murata cites Final Determination of Sales at Less That [sic] *Fair Value: Granular Polytetrafluoroethylene Resin From Italy,* 53 Fed.Reg. 26,096 (Dept.Comm. 1988) *(PTFE Resin),* where the Department concluded the ultimate purchasers of granular PTFE resin were U.S. fabricators who expected to further process the resin into a variety of intermediate products. Similarly, Ericsson explains its processing in the United States is not minor, "since the duplexers purchased by Ericsson from Murata constitute merely one of approximately 180 discrete parts." (Ericsson's Comm. at 10.)

Motorola argues a comparison to Commerce's determination in *Steel Jacks from Canada* is relevant to the issue of subassemblies dedicated exclusively for use in CMTs. *Final Results of Antidumping Duty Administrative Review; Steel Jacks*

*From Canada,* 52 Fed.Reg. 32,957, 32,958 (Dept. Comm.1987) *(Steel Jacks)* ("[W]e determine that both the ultimate use and the ultimate purchasers of jack parts and complete jacks are the same, because jack parts are not used in any other device."). The United States argues Murata's reliance on *PTFE Resin* is incorrect, because PTFE resin is a product which may be used in the production of a wide range of products and at the time of sale, is not dedicated exclusively for use in a particular application. (Def.'s Reply at 9.)

The Department determined Murata's comparison to *PTFE Resin* was misplaced, as that case involved merchandise that, unlike the CMT subassembly, had multiple uses at the time it was purchased by U.S. fabricators and thus, multiple possible ultimate purchasers.

the OEM is an intermediate step. The *ultimate* purchaser of the CMT subassembly is always the purchaser of the complete CMT, because the CMT subassembly, by definition, is not used in any other product." *Id.* at 9.

Because Commerce limited its analysis to Murata's independently-traded components which are "dedicated exclusively for use" in CMTs and because Murata did not present sufficient evidence of widely-varied uses for its components, this Court finds Commerce's conclusion that the expectations of the ultimate purchasers of Murata's independently-traded components are the same as for in-house subassemblies to be supported by substantial evidence on the record and otherwise in accordance with law. This Court similarly finds Commerce's conclusion "[o]nly if a component is not dedicated exclusively for use in a CMT will the expectations of the ultimate purchaser differ," *Final Scope Remand* at 10 (emphasis omitted), to be supported by substantial evidence on the record and otherwise in accordance with law.

### c. The Channels of Trade in Which the Product is Sold

Murata asserts its independently-traded products move in a different channel of trade than finished CMTs because the independently-traded components are sold on the open market to unrelated OEMs—a market to which CMT consumers have no access. In the final scope determination, Commerce determined in-house subassemblies move in the same channels of trade as complete CMTs because they are not " 'traded' except to the extent they are sold after they have been used in CMT production." *Final Scope Remand* at 10 (citing *Final Determination*, 50 Fed.Reg. at 45,448). Motorola argues the independence of a CMT subassembly manufacturer from a CMT manufacturer does not necessarily result in differences in the channels of trade in which their products are sold.

The Department's practice when defining channels of trade is to "examine the type of customer to which the merchandise is sold." *Final Scope Remand* at 11. *See e.g., Certain Cased Pencils from the PRC; Final Determination of Sales at Less Than Fair Value,* 59 Fed.Reg. 55,625 (Dept.Comm.1994); *Final Determination of Sales at Less Than Fair Value;Certain Carbon and Alloy Steel Wire Rod from Brazil,* 59 Fed.Reg. 5,984 (Dept.Comm.1994). In comparing the channels of trade in which in-house subassemblies and Murata's independently-traded subassemblies "dedicated exclusively for use in CMTs" are traded, Commerce concluded both subassemblies at issue were transferred from the component manufacturer to an OEM, and from an OEM (in the form of a CMT) to the ultimate CMT purchaser.[10] Commerce's *Final Determination* recognized there were instances where independently-traded components moved in different channels of trade, but concluded these instances would most probably be "congruent with situations in which the independently traded subassemblies were *not* dedicated exclusively for use in CMTs," *Final Scope Remand* at 12 (emphasis added), and thus were not covered by the *CMT Order*.

Murata has not provided evidence to indicate its components move in channels of trade that are significantly different from the channels of trade for in-house subassemblies. Commerce's *Final Scope Remand* made note of this in concluding, "[t]he fact that Murata's components are sold to unrelated parties and that some of the components may be available to multiple OEMs does not substantially differentiate the channel of trade of Murata's components dedicated exclusively for use in CMTs from in-house CMT subassemblies." *Final Scope Remand* at 12. As a result, Commerce found CMT subassemblies "dedicated exclusively for use" in CMTs move in the same channels of trade as in-

---

**10.** Commerce explained that although the transaction between a component manufacturer and its related OEM would be disregarded by the Department for margin calculation purposes, for scope purposes,

> we find the transaction to be relevant for the limited purposes of examining the channel of trade. In both cases, the CMT purchaser at

> the end of this chain has no access to the market that exists between the subassembly manufacturer and the OEM. The only difference between these two channels of trade is that in the latter chain, the component manufacturer and the OEM are related.

*Final Scope Remand* at 12.

house subassemblies. *Final Scope Remand* at 12. The Court finds Commerce's determination is reasonable, supported by substantial evidence on the record and is otherwise in accordance with law.[11]

#### d. The Manner in Which the Product is Advertised and Displayed

Neither Murata nor Ericsson challenge the Department's determination that "[t]he evidence on the record demonstrates that Murata's components are advertised and displayed differently from in-house CMT subassemblies." *Final Scope Remand* at 13. In its original scope request, Murata submitted product brochures that described the technical specifications of separate CMT components—information designed to appeal to OEMs. This Court finds Commerce's conclusion that "many, but not all, of Murata's subassemblies are advertised differently from in-house subassemblies," *Final Scope Remand* at 14, is supported by substantial evidence on the record and is otherwise in accordance with law.

#### e. The Ultimate Use of the Merchandise in Question

Murata argues the ultimate purchasers of its components are OEMs, and therefore asserts the ultimate use of its components is in the manufacture of CMTs, not as a CMT. Murata considers the actual use of the intermediate components and compares the components to complete CMTs, arguing "[n]o one could ever make a telephone call on a Murata duplexer, VCO, active filter, single filter, paired filter, or isolator." (Murata's Comm. at 16–17.) Motorola, however, argues a Murata duplexer is designed exclusively for use in a CMT and has the same ultimate use as a duplexer made in-house by a CMT manufacturer.

Commerce explained the analysis of the ultimate use of the merchandise in question turns on the identity of the ultimate purchaser. The Department stated,

11. Many of plaintiffs' arguments center on the claim that Commerce was required to compare Murata's independently-traded components to complete CMTs. The Court has already held this

the fact that Murata sells its components to unrelated parties does not make the first unrelated purchaser the ultimate purchaser, and therefore does not dictate the products' ultimate use.... Murata's components are dedicated exclusively for use in CMTs; therefore, there is no other use for them. Thus, the ultimate use of Murata's independently traded subassemblies, which are dedicated exclusively for use in CMTs, is the same as for in-house subassemblies.

*Final Scope Remand* at 15. The Court finds this conclusion is supported by substantial evidence on the record and is otherwise in accordance with law.

In sum, the Court holds Commerce's application of the *Diversified Products* criteria was undertaken properly and within Commerce's discretion. This Court upholds Commerce's conclusion that Murata's subassemblies which are dedicated "exclusively for use" in CMTs are the same "class or kind" of merchandise as that covered by the *CMT Order*. This Court notes Commerce's conclusion that "[a]lthough, the manner in which the product is advertised and displayed differs from the merchandise subject to the CMT order, this factor alone is not dispositive with regard to the analysis of whether Murata subassemblies dedicated exclusively for use in CMTs are covered by the scope of this order," *Final Scope Remand* at 33, and finds the determination of Commerce is supported by substantial evidence on the record and is otherwise in accordance with law.

#### B. Whether Murata's Subassemblies are Circuit Modules

The *CMT Order* defines a subassembly as "*any completed or partially completed circuit modules,* the value of which is equal to or greater than five dollars, and which are [sic] dedicated exclusively for use in CMT transceivers or control units." *CMT Order,* 50 Fed.Reg. at 51,725 (emphasis added). This language indicates the "circuit module" test is a separate and necessary requirement

was not the case. *See, supra,* section A(1) of Discussion (discussion on mode of comparison in *Diversified Products* analysis).

for the inclusion of a component within the scope of the *CMT Order*.

In *Scope Ruling II*, Commerce summarized its findings in *Scope Ruling I* by stating, in relevant part, *"components that contribute to any CMT function* are partially completed circuit modules and therefore are subassemblies covered by the order." *Scope Ruling II* at 2 (emphasis added). Subsequently, in *Murata*, this Court noted while the language of *Scope Ruling II* added a gloss to the definition of subassemblies as expressed in the *Final Determination*, it did not mark an unlawful expansion of the *CMT Order*. Instead, this Court held the inclusion of the clarifying language in *Scope Ruling II* was a permissible clarification of the *CMT Order*, which adequately restricted the *CMT Order* to include only those subassemblies satisfying the three part definition. As a result, this Court held in *Murata*, "Commerce's interpretation of what components constitute a 'partially completed circuit module' is well-within the agency's discretion to adopt." *Murata*, 908 F.Supp. at 988. Similarly, this Court and the CAFC upheld this broad coverage of subassemblies in the *CMT Order* in *Mitsubishi Electric Corp. v. United States*, 12 CIT 1025, 1049–50, 700 F.Supp. 538, 557–58, *aff'd*, 898 F.2d 1577, 1582 (Fed. Cir.1990). Notwithstanding this Court's ruling in *Murata*, in its order remanding the *Ericsson* case, this Court instructed Commerce to "review its determination that the eleven components at issue are 'circuit modules' within the meaning of the antidumping duty order." *Ericsson G.E. Mobile Communications Inc., v. United States*, Court No. 91–09–00703 at 3 (CIT Dec. 18, 1995) (order remanding proceeding to the Department of Commerce). Commerce did so and concluded the subassemblies in question were partially completed circuit modules.

While the term "circuit module" is not defined in the *CMT Order*, in *Scope Ruling I* the Department clarified the definition of subassemblies covered by the *CMT Order*

and explained it did not want to limit coverage to specific subassemblies

> [b]ecause of the difficulty presented in identifying each component to be covered by name, the Department constructed the definition of a subassembly in such a way as to capture within the scope of the order those circuit modules *which perform basic CMT functions* ... Partially completed circuit modules cannot perform basic CMT functions themselves, but they do *contribute to the basic function of CMTs* and therefore, are included in the order.

*Final Scope Remand* at 17 (quoting *Scope Ruling I* at 9) (emphasis added). Commerce stated a subassembly which met the other two requirements of the definition of covered subassemblies (the five-dollar limitation and the "dedicated exclusively for use" test) and which *"performs a function or contributes to the performance of a CMT function* would fulfill the Department's definition of a covered CMT subassembly." *Scope Ruling I*, at 9 (emphasis added). In this way, Commerce explained its definition of a subassembly covered by the *CMT Order* was not unlimited and ensured subassemblies used in non-CMT applications would not be included in the *Order*.

Although plaintiffs acknowledge Commerce's interpretation of a circuit module is consistent with the Court's holding in *Murata*, plaintiffs argue the *Murata* decision is neither binding nor persuasive here. (Murata's Comm. at 38) Plaintiffs claim the Department should reconsider its circuit module analysis and find Murata's independently-traded components are not "completed or partially completed" circuit modules within the meaning of the *CMT Order*. Plaintiffs contend the language is overly broad, asserting "since every electrical circuit in a CMT contributes to the performance of a CMT function—otherwise it would not need to be there—Commerce's 'contributes to a CMT function' test is in fact no test at all." (Murata's Comm. at 35.) [12] Plaintiffs add the Department's "contributes to a function" test

---

12. This argument is similar to the one advanced by plaintiffs in *Murata*. There, plaintiffs argued the new "contributes to a CMT function" test was so broad, "it essentially eviscerates the term 'circuit module' of any substantive meaning.

Any component, no matter how small or minor, could be said to 'contribute' to a CMT function, and thus ... be a 'partially completed circuit module.' " *Murata*, 908 F.Supp. at 983 (quoting *Pls.' Br.* at 41) (footnote omitted).

fails to describe or define the term "circuit module" in a way that provides any meaningful guidance to importers as to what parts are subject to the *CMT Order*. (Matsushita's Comm. at 21–22.) Plaintiffs also claim the term "circuit module" should be limited to major subassemblies which were the subject of Motorola's circumvention concerns and not the discrete components that comprise the circuit modules. (Murata's Comm. at 35.) Plaintiffs cite the IEEE Standard Dictionary of Electrical and Electronics Terms, which defines a module as "[a]ny assembly of interconnected components which ... can be disconnected, removed as a unit, and replaced with a spare." *IEEE Standard Dictionary of Electrical and Electronics Terms* at 554 (2d ed.1977) (*quoted in* Murata's Comm. at 34.). Murata argues its independently-traded components do not satisfy this definition because each of its parts must be combined with numerous other parts in a substantial manufacturing and testing process to produce initially the circuit module subassembly that is combined ultimately with other circuit module subassemblies to form a complete CMT. (*Id.* at 35.)

While plaintiffs' arguments on this issue are interesting, the Court finds Commerce's definition of a circuit module will not, as plaintiffs claim, result in sweeping coverage of all components within the scope of the *CMT Order*. Commerce's definition limits the *CMT Order*'s coverage to components that contribute to basic CMT functions and also meet the other criteria required by the *CMT Order*, such as the five dollar limitation. This Court and the CAFC have previously ruled the language of the *CMT Order* adequately restricted coverage of circuit modules to subassemblies whose circuits performed CMT functions. *See Murata*, 908 F.Supp. at 988; *Mitsubishi*, 898 F.2d at

1584. While Commerce acknowledged the ITC focused its investigation on subassemblies that performed seven basic functions and attached to the CMT transceiver in a particular way, Commerce also determined that even though the ITC did not address components that "contribute to the function" of a CMT in its injury analysis, the Department was within its powers to include such components within the scope of the *Order*.[13] In addition, Commerce, in its Notice of Initiation of the antidumping investigation, set forth a preliminary definition of subassemblies and provided examples of such subassemblies. The notice stated "[s]ubassemblies are circuit modules and/or any other packaged functional assemblage of electronic components.... Examples of such assemblies include ... duplexers." *Cellular Mobile Telephones and Subassemblies From Japan; Initiation on* [sic] *Antidumping Duty Investigation*, 49 Fed.Reg. 47,076, 47,077 (Dept.Comm.1984). Two of the components at issue in this case are duplexers.

This Court upholds Commerce's finding that each of the eleven components subject to the remand contribute to a basic CMT function. As defendant-intervenor pointed out, Murata itself admitted "Murata components (such as VCOs, isolators, or filters—including duplexer filters) ... 'contribute' to a[CMT] function." (App. to Motorola's Comm., tab 1 at 12) (cited in Motorola's November 20, 1996 Letter Responding to this Court's October 31, 1996 Letter).[14] Under Commerce's determination in *Scope Ruling I*, "[p]artially completed circuit modules cannot perform basic CMT functions themselves, but they do contribute to the basic function of CMTs and therefore, are included in the order." *Scope Ruling I* at 9. Murata failed to provide sufficient evidence to convince Commerce that

**13.** As this Court and CAFC made clear in the *Mitsubishi* litigation:

The Commission's determination that the seven "major subassemblies" constituted separate products for determining whether the dumped imports injured an American industry does not mean that the Administration was required to limit its antidumping order to those seven categories of subassemblies....

    . . . .

    "... The Commission's determination of like products and separate industries does not un-

dermine the Administration's determination that to prevent evasion the antidumping order should be broader."
*Mitsubishi*, 898 F.2d at 1584–85.

**14.** On October 31, this Court sent a letter to all parties requesting them to direct the Court to the pages in the record indicating the location of certain evidence referred to by the parties in support of their arguments.

the eleven components at issue do not contribute to a CMT function and thus are not "partially completed circuit modules" as defined by the *CMT Order*. This Court is not persuaded Murata has provided sufficient evidence to justify this Court in overturning Commerce. As a result, this Court finds Murata's independently-traded components are partially completed circuit modules as defined by the *CMT Order*. Commerce's remand determination on this issue is supported by substantial evidence on the record and is otherwise in accordance with law.

C. Whether Murata's Subassemblies are "Dedicated Exclusively for Use" in CMTs

The third element of the definition of subassemblies covered by the *CMT Order* requires subassemblies to be "any completed or partially completed circuit modules . . . which are *dedicated exclusively for use* in CMT transceivers or control units." *CMT Order*, 50 Fed.Reg. at 51,725 (emphasis added). The phrase *"dedicated exclusively for use"* is subsequently defined in the *CMT Order* as "encompass[ing] those subassemblies that are *specifically designed for use* in CMTs, and could not [be] used, *absent alteration*, in a non-CMT device." *Id.* (emphasis added). In *Ericsson I*, plaintiffs asserted with respect to *Scope Ruling I*, Commerce interpreted the "could not be used" phrase in the "dedicated exclusively for use" definition as requiring (1) actual, demonstrated use in a non-CMT device; (2) that such use be commercially available; and (3) that the non-CMT use be subsequent to importation to the United States. Upon reviewing each of these requirements, this Court found Commerce's interpretation of the "could not be used" phrase was an unlawful expansion of the scope of the *CMT Order* and not simply a clarification of its language. *See Ericsson I*, 17 CIT at 578–81, 825 F.Supp. at 1090–93.

In *Ericsson III*, the CAFC agreed and held Commerce's requirement of commercial availability and of non-CMT use in the United States went beyond a mere clarification of the *CMT Order*. The CAFC, however, disagreed with this Court's conclusion that the "could . . . be used" language could only re-

fer to potential use. The Federal Circuit's opinion stated

> it was not unreasonable for the Commerce Department to interpret the antidumping duty order to exclude products that were used as CMT subassemblies only upon proof that the products had some other actual use; the phrase "could . . . be used" is not necessarily limited to any conceivable, hypothetical use, but can reasonably be interpreted to require some existing use to which the product could realistically be put. An "actual use" interpretation would also be consistent with the purpose of the antidumping duty order—to apply the antidumping duty to products that are being imported solely for use in CMTs. Thus, one fair construction of the phrase "could . . . be used" is that a particular item "could" be used in a non-CMT device only if there is an actual use for it in such a product.

*Ericsson III*, 60 F.3d at 782. The CAFC held this Court should not have entered final judgment for the plaintiffs on the record before this Court. *Id.* at 783. As a result, the CAFC reversed this Court's ruling with respect to the "could . . . be used" language and remanded the proceeding, directing this Court to remand the issue to Commerce to allow Commerce another opportunity to interpret the *CMT Order* "according to any of its legally acceptable options." *Id.* This Court did so and instructed Commerce to reconsider and reapply the "dedicated exclusively for use" test contained in the antidumping duty order not inconsistently with *Ericsson III* and with those portions of *Ericsson I* not appealed, if any, with respect to the nine components that were the subject of *Ericsson I*.

■ In the *Final Scope Remand*, Commerce fulfilled this Court's mandate and reviewed and reevaluated the "potential use" standard, as well as the CAFC's holding in *Ericsson III* and the evidence on the record. Commerce declined to adopt a potential use standard as advocated by plaintiffs. Instead, Commerce determined a CMT subassembly is dedicated exclusively for use in a CMT and could not be used, absent alteration, in a non-CMT device, thus satisfying the *CMT Order's* requirements

unless a party provides evidence of actual use in a non-CMT device. While the non-CMT device need not be commercially available, when the evidence of the non-CMT use presented to the Department suggests that the use may be contrived solely for purposes of seeking an exclusion from the scope of the order, the Department will consider the commercial availability of the non-CMT device in its determination.

*Final Scope Remand* at 28.

This Court holds Commerce's test for determining which subassemblies are "dedicated exclusively for use" in CMTs is supported by substantial evidence on the record and is otherwise in accordance with law. The CAFC explicitly disagreed with this Court's determination that the "could ... be used" language could only refer to potential use and stated "it was not unreasonable for the Commerce Department to interpret the antidumping duty order to exclude products that were used as CMT subassemblies only upon proof that the products had some other actual use." *Ericsson III,* 60 F.3d at 782. The CAFC explicitly stated this Court's interpretation of the *CMT Order* was "not necessarily the only lawful one," and it instructed this Court to remand the case to the Department of Commerce so that it would have another opportunity to reach its own "legally acceptable" conclusion. Commerce's interpretation of the *CMT Order* as requiring demonstration of actual use is within the Department's discretion and consistent with the determinations of the CAFC and this Court, and with the structure of the *CMT Order.* Moreover, an actual use standard is predictable, administratively feasible and will prevent circumvention of the *CMT Order* by parties who might incorporate a subassembly into a contrived non-CMT product for a one-time use in an effort to evade antidumping duties.

■ Accordingly, this Court finds a component which cannot be used, absent alteration, in a non-CMT device is "dedicated exclusively for use" in a CMT unless a party provides evidence of the components's actual use in a non-CMT device. While the non-CMT device need not be commercially available, when the Department acquires evidence suggesting the use may be contrived solely for purposes of seeking an exclusion from the scope of the *CMT Order,* the Department may consider the commercial availability of the non-CMT device in its determination of whether the subassembly could realistically be used in a non-CMT product.

■ Based on Commerce's application of the lawfully-adopted actual use standard to the information placed in the record by plaintiffs, the Department determined four of the nine products at issue in *Ericsson I* were "dedicated exclusively for use" in CMTs and thus were within the scope of the *CMT Order.* The *CMT Order* places the burden of proof on Murata to prove there is a valid non-CMT use for a component "absent alteration." The evidence placed on the record by Murata does not demonstrate its components actually are used in non-CMT devices. Evidence of similarities between Murata's components and virtually identical next-generation components which have actual non-CMT uses does not satisfy the explicit requirement that to be excluded from the *CMT Order,* the Murata component itself must be used "*absent alteration,* in a non-CMT device." *CMT Order,* 50 Fed.Reg. at 51,725 (emphasis added). Indeed, Murata itself admitted it had no evidence as to how several of the components were actually used. (*See* App. to Murata's Comm. in Opp'n Remand, tab E at 48–50.) Further, other evidence cited by Murata, such as the ITC statement in the original antidumping investigation that duplexers and VCOs are not used exclusively in CMTs, only demonstrates potential and not actual use of its components in non-CMT devices. *ITC Final Report* at A–7, n.3. As a result, this Court finds Murata has not shown the specific components at issue in this proceeding are actually used, absent alteration, in non-CMT devices. This Court will examine each of the components in turn.

D. Revaluation of the Subassemblies at Issue

The Department examined both Murata's claims its subassemblies at issue were similar to next-generation models that had non-CMT uses, as well as defendant's claims the record contained no evidence of actual non-CMT use

with respect to the four subassemblies found to be within the scope of the *CMT Order*. Commerce concluded Murata's claims regarding the comparability of the subject subassemblies and the next-generation models were not supported by record evidence, and declined to use the allegedly similar subassemblies as surrogates for the subject subassemblies. Plaintiffs, however, argue the Department's findings with respect to three of the four subassemblies are not supported by substantial evidence on the record or otherwise in accordance with law.[15]

*(1) VCO MQC013–835*

Murata claims Commerce ignored record evidence as to the actual differences and similarities between *VCO MQC013–835* and *VCO MQC007–835* which, according to Murata, is sold for measuring equipment, among other purposes. In a letter dated July 24, 1991, which was submitted to "provide evidence of possible uses, absent alteration, of the VCO," Murata's Manager of Product Development, Department II, Functional Device Division, asserts *VCO MQC013–835* "which was sold in the mid–1980's, is very similar to MQC007–835, which is a VCO sold currently [as of 1991] for measuring equipment, among other purposes." (App. to Pls.' Joint Resp. to Ct.'s 10/31/96 Letter ("App. to Joint Resp."), tab 4 at 1.) Murata argues *VCO MQC013–835* could have been used for the same actual non-CMT device as *VCO MQC007–835*. Commerce, however, determined the record did not provide evidence as to whether the basis for the non-CMT use of *VCO MQC007–835* was the characteristics common to *VCO MQC013–835* or other characteristics unique to *VCO MQC007–835*. Commerce explained that although the diagrams and specifications attached to Mura-

ta's letter revealed differences in the electrical characteristics of the two VCOs, "Murata has provided no explanation of these differences or their significance with respect to the ability to use the MQC013–835 VCO in the measuring equipment application absent the alterations in electrical characteristics." *Final Scope Remand* at 31. Therefore, the Department held *VCO MQC013–835* to be a circuit module within the scope of the *CMT Order*.

*(2) DFC6R883P026BTM*

Murata also claims it provided evidence of actual non-CMT use with regard to single filter *DFC6R883P026BTM* in a letter dated July 24, 1991 from the Manager of the Product Engineering Department, Microwave Component Group, Functional Device Division. Murata argues the uncontroverted record evidence reflects this single filter was only sold to Motorola "on several occasions, . . . only in small quantities" for evaluation purposes. (App. to Joint Resp., tab 14 at 1.) Defendant, however, argues Murata provided no evidence as to whether the evaluation involved CMT or non-CMT devices. Further, Murata also claims this filter was very similar to *DFC5R881P025BTR*, which, as of 1991, was used in a transmitter for an AMPS base station, a non-CMT device. Commerce, however, determined the evidence in the record did not show whether the basis for the filter's non-CMT use is characteristics common to *DFC6R883P026BTM* or other characteristics unique to *DFC5R881P025BTR*. Commerce noted Murata "provided no discussion of the actual differences and similarities of these two filters" and the specifications Murata submitted with its letter "revealed differ-

---

**15.** Components AFC 94A001X2, AFC 911F001A1, AFC 920A001A2, and *AFM 98F001A2* were found to be outside the scope of the *CMT Order* based on evidence that in 1985 and 1986, they would have been used in a pocket-size, self-contained, portable cellular telephone, a non-CMT device. *Final Scope Remand* at 31–32. As there was "no contradictory evidence on record," *Id.* at 32, this Court finds Commerce's determination to hold these subassemblies outside the scope of the *CMT Order* is supported by substantial evidence on the record and is otherwise in accordance with law. *VCO*

MQC013–785 was also determined to be outside the scope of the *CMT Order* based on Murata's demonstrating actual use of the component by a Japanese original equipment manufacturer in a global positioning system, a non-CMT device. *Id* at 31. Commerce noted "[t]here is no record evidence suggesting that this information is inaccurate." *Id.* As a result, this Court finds Commerce's determination with regard to this component is supported by substantial evidence on the record and is otherwise in accordance with law.

ences in the electrical characteristics of the two filters. Murata has provided no explanation of these differences or their significance with respect to the ability to use the DFC5R881P025BTR filter in the AMPS base station application absent the alterations in the electrical characteristics." *Final Scope Remand* at 32. Commerce therefore determined this filter to be a subassembly within the scope of the *CMT Order*.

### (3) DFC6R838P026BTM

With respect to *DFC6R838P026BTM,* Murata argued in a July 24, 1991 letter to Commerce from the Manager, Product Engineering Department, Microwave Component Group, Functional Device Division, that "AT & T is using a very similar part, *DFC835P025BTR* for the receiver of the AMPS base station made by AT & T which is commercially available in the U.S. . . . [B]ecause of the great similarities, DFC*6R838P026BTM* could be used in a base station which is a non-CMT device." (App. to Joint Resp., tab 13 at 2.) Murata also argued this single filter was only sold to Motorola in small quantities for evaluation purposes. Once again, Commerce concluded the specifications submitted by Murata revealed differences in the electrical characteristics of the two components and Murata "provided no explanation of these differences or their significance with respect to the ability to use the DFC835P025BTR filter in the AMPS base station application absent the alterations in electrical characteristics." *Final Scope Remand* at 33. The Department again held it could not determine whether the basis for that filter's non-CMT use was characteristics in common to DFC*6R838P026BTM* or other characteristics unique to *DFC835P025BTR.* As a result, Commerce determined the filter was a subassembly within the scope of the *CMT Order*.

### (4) DFY3R784CR835B

Finally, with respect to *DFY3R784CR835B,* Murata submitted a letter to the Department dated July 24, 1991 from the Manager of the Product Engineering Department, Microwave Component Group, Functional Device Division, claiming

the duplexer "could be used in pocket-size, self-contained, portable cellular telephones." (App. to Joint Resp., tab 10 at 1.) Commerce, however, determined the manager's statement concerning the component's non-CMT use "is purely hypothetical" and Murata did not dispute this determination in its comments on the draft remand determination. Indeed, plaintiffs, in their Joint Response to the Court's Letter of October 31, 1996, admitted that the July 24, 1991 letter demonstrated only "potential use in a PCT." (Pls.' Joint Resp. to Ct.'s 10/31/96 Letter at 3.) Therefore, the Department determined *DFY3R784CR835B* was within the scope of the *CMT Order*.

The Department's determination that these four components fall within the scope of the *CMT Order* was reasonable and is entitled to deference by this Court. Because Commerce could not determine whether the basis for the non-CMT use of the similar next-generation components was characteristics common to the Murata components at issue or unique to the next-generation components, Commerce acted reasonably in including the four components within the *CMT Order*. Murata provided no other evidence of actual use in a non-CMT device for the components at issue. Accordingly, this Court finds Commerce's remand decision as to this issue is supported by substantial evidence on the record and is otherwise in accordance with law.

## V. CONCLUSION

After carefully considering the arguments of all parties, this Court sustains the results of Commerce's *Final Scope Remand—Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies from Japan: Murata Manufacturing Co., Ltd.* (dated June 17, 1996). The general physical characteristics, expectations of the ultimate purchasers, channels of trade, and the ultimate use of Murata's independently-traded cellular mobile telephone components indicate they are of the same "class or kind" of merchandise as the CMTs covered by the antidumping duty order because they meet the criteria for subassemblies as defined in the *CMT Order*. Furthermore, the evidence placed on

**1532**

the record demonstrates each of Murata's components "contributes to a CMT function" and are "completed or partially completed circuit modules" within the meaning of the *CMT Order.* Finally, this Court sustains Commerce's finding that a product is "dedicated exclusively for use" in a CMT and cannot be used "absent alteration" in a non-CMT device unless a party provides evidence of actual use in a non-CMT device. Additionally, this Court sustains the Department's consideration of the commercial availability of non-CMT devices when evidence of non-CMT use presented to the Department suggests the use may be contrived solely for purposes of seeking an exclusion from the scope of the order. With respect to the nine subassemblies relevant to the "dedicated exclusively for use" issue, this Court sustains the Department's finding that four of the nine components are "dedicated exclusively for use" in CMTs and, therefore, are within the scope of the *CMT Order.* This Court also sustains the Department's conclusion that the remaining five subassemblies are not "dedicated exclusively for use" in CMTs and are not within the scope of the *CMT Order.* This action is dismissed.

### JUDGMENT ORDER

**ORDERED** that the results of Commerce's *Final Scope Remand—Antidumping Duty Order on Cellular Mobile Telephones and Subassemblies from Japan: Murata Manufacturing Co., Ltd.* (dated June 17, 1996) are sustained; and it is further

**ORDERED** that this action is dismissed.